**UNITED STATES of America, Plaintiff,**

**v.**

**Michael FREEDMAN and Randall Scott Moore, Defendants.**

**No. 82 CR 840.**

United States District Court,
N.D. Illinois, E.D.

July 26, 1983.

Dan K. Webb, U.S. Atty., Vincent J. Connelly, Julian Solotorovsky, Asst. U.S. Attys., Chicago, Ill., for plaintiff.

Frank Oliver, Northfield, Ill., for defendant Freedman.

Gerald Werksman, Chicago, Ill., for defendant Moore.

MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Michael Freedman ("Freedman") and Randall Scott Moore ("Moore") have been indicted for (1) conspiracy to commit extortion, extortion and attempted extortion in violation of 18 U.S.C. § 1951 (the "Hobbs Act") (Counts I to IV) and (2) mail fraud in violation of 18 U.S.C. § 1341 ("Section 1341") (Counts V and VI).[1] This Court's May 12, 1983 memorandum opinion and order (562 F.Supp. 1378, the "Opinion") dismissed Counts I through IV. Freedman and Moore have now renewed their earlier motions (addressed to the original indictment) to dismiss Counts V and VI. For the reasons stated in this memorandum opinion and order their motion is granted.

*Background Facts and Counts V and VI*[2]

As detailed more fully in the Opinion, 562 F.Supp. at 1380, Freedman and Moore were at all relevant times licensed Illinois attorneys. They had been retained to represent Sean O'Toolis ("O'Toolis") in pending Illinois criminal prosecutions. They conspired to obtain and then did obtain from O'Toolis payments they represented they would use to bribe the judge presiding at O'Toolis' criminal trial. There is no allegation in the Indictment asserting any approach to or involvement by any state judge in the alleged scheme.

Counts V and VI are substantially identical, charging two separate mailings in viola-

tion of Section 1341 (each Count's ¶ 12). Paragraphs 1–4 of those Counts:

1. identify Freedman and Moore as Illinois attorneys and O'Toolis as a state criminal defendant;

2. recite a portion of Illinois' bribery statute, Ill.Rev.Stat. ch. 38, § 33–1;[3] and

3. specify Cook County Circuit Court judges are public officers (whose bribery would therefore violate that state statute).

Paragraphs 5–11 state the substance of Counts V and VI:

5. From in or about November of 1981, through and including in or about February of 1982, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

MICHAEL FREEDMAN and RANDALL SCOTT MOORE,

defendants herein, together with co-schemers known and unknown to the grand jury, devised and intended to devise a scheme:

(a) to defraud Cook County, its citizens and the Circuit Court of Cook County of their right to have the legal and judicial process of the Circuit Court of Cook County conducted honestly, fairly and impartially, free from corruption, collusion, dishonesty, bribery and fraud, and in accordance with the laws of the State of Illinois; and

\*  \*  \*  \*  \*  \*

(d) He receives, retains or agrees to accept any property or personal advantage which he is not authorized by law to accept knowing that such property or personal advantage was promised or tendered with intent to cause him to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness; or

(e) He solicits any property or personal advantage which he is not authorized by law to accept pursuant to an understanding that he shall influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness.

---

1. Freedman and Moore were originally charged in an indictment filed November 23, 1982. After defense motions were filed and commented on by this Court, a superseding indictment was filed January 18, 1983 and then a second superseding indictment (the "Indictment") was filed January 28.

2. All the facts recited in this section are drawn from the Indictment (the allegations of which are assumed true for present purposes) and supplementary filings by the parties. See 562 F.Supp. at 1380 n. 4.

3. Though the disparity is not significant for present purposes, the Indictment misquotes the statute. In relevant part the statute reads (the Indictment omits "or witness" at the end of each subsection):

A person commits bribery when:

(b) to defraud Cook County, its citizens and the Circuit Court of Cook County of their right to the services, decisions, actions and performance of legal duties by defendants . . . , in their capacities as attorneys practicing before the Circuit Court of Cook County, free from corruption, bribery, dishonesty and fraud; which said scheme is set forth more fully below.

6. It was a part of the scheme that defendants . . . would and did represent to their client, Sean O'Toolis, that he would not be convicted if he paid approximately $3,000 to them.

7. It was further a part of the scheme that the defendants . . . would and did represent that they would use a substantial part of the money provided by their client to bribe the judge in their client's cases.

8. It was further a part of the scheme that on or about December 16, 1981, defendant MICHAEL FREEDMAN met with client, Sean O'Toolis, in Chicago, Illinois, and represented that the $1,500 portion of the requested payment provided by their client would be used to pay the judge in his pending cases.

9. It was further a part of the scheme that on or about January 8, 1982, defendants . . . met with their client, Sean O'Toolis, in their law office at 30 West Washington Street and represented that the $300 portion of the requested payment provided to them by their client would be used to pay the judge in his pending cases.

10. It was further a part of the scheme that on or about January 21, 1982, already having received earlier payments, defendant MICHAEL FREEDMAN solicited and received an additional $500 from his client based upon the defendant's representation that the money was needed to pay the judge in his client's pending cases.

11. It was further a part of the scheme that defendants . . . would and did mail to their client correspondence relating to the pending Circuit Court of Cook County case of their client.

Those paragraphs thus charge a scheme to defraud the public of some "intangible rights," but there is no allegation defendants (1) held public office, (2) had influence over a public official or (3) were actually involved with any "known [or] unknown" public official in their purported bribery arrangement and alleged scheme.[4]

### Private Citizens and Public Duties

■ Section 1341 provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly

---

4. Paragraph 5 of each count does refer to Freedman and Moore as having devised their scheme "together with co-schemers known and unknown to the grand jury." If a state judge were in fact an unnamed coconspirator, the analysis in this opinion would be wholly different. But no such assumption can be made for current purposes:

1. Every criminal defendant has a right to know the basic nature of the charge against him. Given the allegations of Counts V and VI—which refer specifically to the judge in each of Paragraphs 7 through 10—the strong negative implication from his not being referred to in Paragraph 5 is that he was not one of the unnamed "co-schemers."

2. Throughout the government's response to the current motion it eschews the easy (and unanswerable) argument that would be available were Freedman and Moore conspiring with a judge to deprive the citizenry of their right to an honest judicial system (of which more later).

causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

It is too late to argue, as an original proposition, that it strains that statutory language to embrace "intangible rights" schemes to defraud—such as those by public officials to deprive their constituencies of the right to good government or honest services. Section 1341 prosecutions of public officials for depriving citizens of their "intangible rights" to good government or to honest services are too well established. *See, e.g., United States v. Margiotta,* 688 F.2d 108, 121 (2d Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983); *United States v. Mandel,* 591 F.2d 1347, 1358–62 (4th Cir.), *aff'd en banc in relevant part,* 602 F.2d 653 (4th Cir.1979), *cert. denied,* 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980); *United States v. Keane,* 522 F.2d 534, 546 (7th Cir.1975), *cert. denied,* 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746 (1976); *United States v. Isaacs,* 493 F.2d 1124, 1149–50 (7th Cir.), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974). And there is no doubt a private attorney who uses the mails to carry out a scheme to defraud involving the actual bribery of public officials is indictable under Section 1341 on an "intangible rights" theory. *See United States v. McManigal,* 708 F.2d 276, 278–82 (7th Cir.1983).

■ Thus the United States would seem to have had no difficulty in shaping an invulnerable Section 1341 indictment against Freedman and Moore whether or not the state court judge had been implicated in their alleged scheme:

1. If he or she had been, an "intangible rights" indictment would lie under *McManigal.*

2. If he or she had not been—if the alleged Freedman-Moore representations to O'Toolis were false—a garden-variety scheme to defraud O'Toolis (not the public) would appear to be chargeable under Section 1341.[5]

3. If the government were uncertain how the jury might view any evidence as to the judge's involvement, a two-count indictment (one charging "intangible rights" as described in paragraph 1, the other charging conventional mail fraud as described in paragraph 2) would cover both alternatives and leave the fact resolution to the jury.

But for whatever reasons, Counts V and VI invoke a different concept entirely. They pose the question whether Freedman and Moore can have devised a scheme to defraud the citizenry of good government if they were in no way connected in that scheme to a public official.

Freedman and Moore[6] contend (Mem. 1) they cannot as private citizens be prosecuted under such a Section 1341 "intangible rights theory." In response the government relies (Ans.Mem. 1–6) principally on the general breadth of Section 1341 as interpreted by the courts, but also specifically on the analysis in *Margiotta.* But on analy-

---

**5.** This Court has not, however, researched the question whether that conclusion would be affected by the illegality of the proposal defendants allegedly made to O'Toolis. Accordingly, the conjecture in the text should not be mistaken for a definitive holding.

**6.** Moore filed the initial brief in support of defendants' joint motion, and Freedman has joined in Moore's argument. After the deadline for defendants' reply brief had passed and this opinion was already prepared, Freedman's counsel tendered a reply memorandum consisting of an opaque philosophical and historical assault on the whole "intangible rights" theory

of fraud. It is a disservice to the system to tender such a document (which must be read to be appreciated, if that is the right term) to a district court bound by the overwhelming weight of authority in this area (even were it inclined to breach its own duty by flouting that authority). But for the fact this Court had already decided the pending motion favorably to defendants, so that the filing worked no substantive harm, this Court would have given some consideration to a sua sponte striking of the late and surreal filing. In some respects it is scandalous; in all respects it is bizarre.

sis *Margiotta* actually supports defendants' position.[7]

Defendant Margiotta, a political leader without public office, was prosecuted under both the Hobbs Act and Section 1341. Judge Kaufman's opinion for the court made Margiotta's position between private and public life the central factor in the propriety of his Section 1341 prosecution on an "intangible rights" theory (688 F.2d at 121–25, citations and footnote omitted):

> The instant case raises the novel issue whether an individual who occupies no official public office but nonetheless participates substantially in the operation of government owes a fiduciary duty to the general citizenry not to deprive it of certain intangible political rights that may lay the basis for a mail fraud prosecution. In the private sector cases, a formal employer-employee relationship is not a prerequisite to a finding that a fiduciary duty is owed.... Similarly, we do not believe that a formal employment relationship, that is, public office, should be a rigid prerequisite to a finding of fiduciary duty in the public sector....
>
> The drawing of standards in this area is a most difficult enterprise. On the one hand, it is essential to avoid the Scylla of a rule which permits a finding of fiduciary duty on the basis of mere influence or minimum participation in the processes of government. Such a rule would threaten to criminalize a wide range of conduct, from lobbying to political party activities, as to which the public has no right to disinterested service. On the other hand, the harm to the public arising from the sale of public office and other fraudulent schemes leads us to steer a course away from the Charybdis of a rule which bars on all occasions, as a matter of law, a

holding that one who does not hold public office owes a fiduciary duty to the general citizenry even if he in fact is conducting the business of government.

> Although there is no precise litmus paper test, two time-tested measures of fiduciary status are helpful: (1) a reliance test, under which one may be a fiduciary when others rely upon him because of a special relationship in the government, and (2) a de facto control test, under which a person who in fact makes governmental decisions may be held to be a governmental fiduciary.... These tests recognize the important distinction between party business and government affairs, permitting a party official to act in accordance with partisan preferences or even whim, up to the point at which he dominates government. Accordingly, the reliance and de facto control tests carve out a safe harbor for the party leader who merely exercises a veto power over decisions affecting his constituency....
>
> In light of these guidelines, the prosecution of Margiotta under the mail fraud statute was permissible, notwithstanding the fact that the appellant held no official public office. It cannot be gainsaid that Margiotta had a stranglehold on the respective governments of Nassau County and the Town of Hempstead. According to Donald Woolnough, one of Margiotta's principal assistants, "everything went through his hands." The evidence established not only that he was responsible for the administration of the municipal insurance activities, but also that he acted as a virtual Department of Personnel, with substantial power over decisions concerning hiring, promotions and salary increases. Others relied upon him for the

---

**7.** As already indicated, the "intangible rights" cases are, if not legion, at least numerous. Nonetheless this opinion limits itself to extended quotation from, and exegesis of, *Margiotta* because both sides agree it represents the outermost reach of the cases to the non-public-official:

 1. Defendants say at Mem. 2 it "may be considered the furthest extension to date of the theory upon which the government wishes to proceed."

 2. At Ans.Mem. 4 "the government contends that the analysis in *Margiotta* is controlling."

 3. And even though Freedman's counsel reviles "*Margiotta* and its litter mates" (R.Mem. 2), he concedes (*id.* at 1) "there is no need to examine other contemporary authority."

If *Margiotta*'s analysis does not save Counts V and VI, they are beyond redemption.

rendering of important governmental decisions, and he dominated governmental affairs as the de facto public leader. As a result, the federal mail fraud statute properly supported a prosecution for Margiotta's breach of at least a minimum duty not to sell his substantial influence and control over governmental processes....

Margiotta's argument that the legislative history does not support the application of the mail fraud statute to private participants in the political process, regardless of the extent to which they dominate the affairs of government, is unavailing. While the mail fraud statute, originally enacted as § 301 of the Act of June 8, 1872, ch. 335, 17 Stat. 283, 323, resulted from a recommendation of a committee of postal officials for legislation "to prevent the frauds which are perpetrated by lottery swindlers through the mails," § 1341 has never been limited to this narrow purpose.... Yet no legislative history exists to suggest that Congress has intended the mail fraud statute to deal only with schemes to defraud involving money or property, ... let alone to be subject to a hard-and-fast distinction between public officeholders and dominant non-public officeholders in cases involving intangible political rights. Accordingly, our construction of § 1341 furthers the basic purpose of the statute in proscribing the use of the mails to promote fraudulent enterprises....

Furthermore, Margiotta's prosecution does not exceed the permissible bounds of the statutory language. More than five decades ago, the Supreme Court stated that the phrase "scheme to defraud" extends to "a great variety of transactions." ... In his brief, appellant has conceded that a deprivation of an intangible right to a defendant's honest and faithful services properly forms the basis for a mail fraud violation where the defendant owes a fiduciary duty to the alleged victim. As a result, while the question remains whether Margiotta owed a fiduciary duty to the general citizenry of the Town of Hempstead and Nassau County, there is

no merit to Margiotta's claim that the language of the federal mail fraud statute cannot embrace a theory of fiduciary fraud by one, like the appellant, who has de facto control over the processes of government and is relied upon by others in the rendering of essential governmental decisions....

Margiotta argues that, even assuming the applicability of the statute to his role in the insurance scheme, he owed no fiduciary duty to the general citizenry under federal or state law upon which a mail fraud violation could be predicated. At the outset, we reject his contention that absent a showing of a violation of New York statute or a duty imposed by New York law, a defendant may not be found guilty of using the mails in furtherance of a scheme to defraud on the basis of a breach of a fiduciary duty to the citizenry....

Margiotta argues that his fiduciary duty to the Republican Party, which arises from his position as a party officer, would be impaired by a finding of a fiduciary duty to the citizenry requiring disinterested conduct. But while his party position may have been the springboard to control of the municipal governments, it is his participation in government, not his party position, which creates his fiduciary duty to the citizens....

As noted above, the district court instructed the jury that it must determine whether the work done by Margiotta was "in substantial part the business of government, rather than being solely party business and that his performance of that work was intended by him and relied on by others in Government as part of the business of Government." This instruction reflects the concepts of reliance, and de facto control and dominance, which are at the heart of the fiduciary relationship.... Accordingly, the jury could properly find that Margiotta owed a special duty to the electorate under New York law.

Judge Kaufman's extended comments make it clear Section 1341 was able to reach

private citizen Margiotta on an "intangible rights" theory only because:

1. Margiotta's actual "stranglehold" over local governments meant (a) others could reasonably rely on his relationship to government power and (b) he in fact made governmental decisions; and

2. Margiotta's actual participation in government gave rise to a fiduciary duty to the citizenry.

Merely stating those factors reveals Freedman and Moore cannot be reached by *Margiotta*'s analysis. Indeed *Margiotta*'s emphasis on its defendant's exercise of de facto public power compels the conclusion Freedman and Moore could not have schemed to defraud the citizenry in the way charged by the Indictment.

 As a fallback position the government claims Freedman and Moore *as lawyers* (Indictment ¶ 5(b)) owed a fiduciary duty to the public via their professional ethical obligations (Ans.Mem. 3–4). But a lawyer's basic duty is to be an advocate for his client, *see Polk County v. Dodson,* 454 U.S. 312, 322 & n. 13, 102 S.Ct. 445, 452 & n. 13, 70 L.Ed.2d 509 (1981). True, a lawyer also has "ethical obligations to the judicial system," *id.* at 323, 102 S.Ct. at 452. But as the Court said in *Polk County, id.* at 319, 102 S.Ct. at 450, criminal defense representation "is essentially a private function . . . for which state office and authority are not needed." Professional ethical violations, "although bearing on intent to defraud, do not in and of themselves establish the substantive crime of mail fraud" under Section 1341. *United States v. Rabbitt,* 583 F.2d 1014, 1025 (8th Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979).

Here the government, like the losing party in *Polk County,* tries to make the idea that a lawyer is "an officer of the court" (*Polk County,* 454 U.S. at 318, 102 S.Ct. at 450) carry too much baggage, *id.* at 319 n. 9, 102 S.Ct. at 450 n. 9:

Although lawyers are generally licensed by the States, "they are not officials of government by virtue of being lawyers."

*In re Griffiths,* 413 U.S. 717, 729, 93 S.Ct. 2851, 2858, 37 L.Ed.2d 910 (1973).

What is missing from the Indictment is thus decisive: There is no allegation of any nexus between defendants and a person or office in a position to defraud the citizenry of their "intangible rights."

*Conclusion*

Essentially the defect in Counts V and VI parallel the defect that doomed Counts I to IV, *see* 562 F.Supp. at 1384–90. Defendants' motion to dismiss Counts V and VI of the Indictment is granted.