**UNITED STATES of America, Plaintiff,**

v.

**Cyrus YONAN, Defendant.**

**No. 84 CR 246.**

United States District Court,
N.D. Illinois, E.D.

Nov. 15, 1985.

**722**

Anton R. Valukas, U.S. Atty., Michele E. Smith, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

Edward R. Genson, Thomas A. Corfman, Genson & Steinback, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Cyrus Yonan ("Yonan") is charged in a ten-count second superseding indictment[1] with:

1. violation of 18 U.S.C. § 1962(c),[2] one of the provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), Sections 1961–1968 (Count One);

2. violation of Section 1962(a), another RICO provision (Count Two); and

3. eight violations of Section 1341, the mail fraud statute (Counts Three through Ten).

Yonan has moved for dismissal of each count, asserting different theories as to the different substantive charges. For the reasons stated in this memorandum opinion and order, Yonan's motion is granted in part and denied in part.

*Count One: Section 1962(c)*

Lawyer Yonan is that rarest of rarae aves: a sole practitioner. To bring him

---

1. As the case number indicates, this indictment is whiskered in criminal-case terms (particularly since the advent of the Speedy Trial Act). It had been pending on Judge McMillen's calendar from the time the original indictment was returned in early 1984 until August 20, 1985, when this Court received it by random reassignment because Judge McMillen had realized he would be unable to dispose of the case before his scheduled retirement from our District Court. This Court acquired the case cum onere—with a pending motion to dismiss the most recent superseding indictment, which had just been returned July 17, 1985. This Court promptly set a schedule for completion of the briefing on the motion to dismiss, a schedule that has now been complied with.

2. All further references to sections of Title 18 will simply take the form "Section—."

within the reach of Section 1962(c), the government has embraced the strained reading that first saw the light of day in our Court of Appeals' civil RICO decision in *McCullough v. Suter,* 757 F.2d 142 (7th Cir.1985)—the notion that a sole practitioner can, in some metaphysical sense, be "employed by" or "associated with" himself or herself.[3] After all, the only conduct Section 1962(c) makes unlawful is defined this way:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

*McCullough* certainly does violence to the normal use of that language. Though Judge Posner's opinion does not (of course) acknowledge just how much it bends RICO out of shape, the opinion reaches its result in these terms (757 F.2d at 144):

> There would be a problem if the sole proprietorship were strictly a one-man show. If Suter had no employees or other associates and simply did business under the name of the National Investment Publishing Company, it could hardly be said that he was associating with an enterprise called the National Investment Publishing Company; you cannot associate with yourself, any more than you can conspire with yourself, just by giving yourself a *nom de guerre.* We therefore held in *Haroco, Inc. v. American National Bank & Trust Co.,* 747 F.2d 384, 399–402 (7th Cir.1984), cert. granted, —— U.S. ——, 105 S.Ct. 902, 83 L.Ed.2d 917 (1985), that an enterprise (a national banking association in that case) could not associate with itself for purposes of section 1962(c). But Suter had

several people working for him; this made his company an enterprise, and not just a one-man band; and all section 1962(c) requires, as we said in *Haroco,* is "some separate and distinct existence for the person [Suter] and the enterprise [National Investment Publishing Company]," 747 F.2d at 402.

Even on the government's own terms, *McCullough* does not necessarily keep Count One in court. Two months ago our Court of Appeals looked at *McCullough* in a criminal (rather than civil) RICO context in *United States v. DiCaro,* 772 F.2d 1314 (7th Cir.1985). DiCaro's counsel did not argue, and therefore the Court of Appeals had no occasion to consider whether, the *McCullough* doctrine could be applied retrospectively without violating due process [4]—a subject hereafter dealt with in this opinion. What the Court of Appeals did do was to reverse DiCaro's RICO conviction because *Haroco* rather than *McCullough* governed his situation (*id.* at 1319–20):

> Based on our analysis of both the statutory language and the underlying policies of section 1962(c), we held in *Haroco* that an individual corporation could not be held liable as a "person" that conducted its own affairs through a pattern of racketeering activity under that section. *Id.* We began by noting that the terms "person" and "enterprise" are both defined in section 1961 of RICO to include "any corporation," *id.,* just as both are defined to include "any individual." Nevertheless, section 1962(c) provides that the person who is charged with conducting the enterprise's affairs through a pattern of racketeering activity must also be "employed by or associated with" the enterprise. *Id.* Thus, if we construed section 1962(c) to permit the same entity to be both the person and the enterprise,

---

**3.** *McCullough* accomplishes that sleight of hand by defining the sole proprietor, when assisted by others (here the "others" are singular—the lawyer's secretary), as an "enterprise." That amiable fiction then assertedly permits the same sole proprietor to put on the other hat of being

a "person" who is "associated with" or "employed by" that person's own "enterprise."

**4.** *DiCaro, id.* at 1319 did not identify that due process argument as having been one of defendant's lines of attack on his RICO conviction.

we would reach the anomalous result that the entity was employed by or associated with itself. After considering the language of section 1962(c), we therefore concluded that Congress did not intend to allow the same entity to be both the person and the enterprise under section 1962(c). *Id.*

\* \* \* \* \* \*

We recently reaffirmed this interpretation of section 1962(c) in *McCullough v. Suter,* 757 F.2d 142 (7th Cir.1985). In *McCullough,* we held that the defendant-proprietor of a sole proprietorship could be held liable under section 1962(c) on the theory that he conducted the affairs of the proprietorship through a pattern of racketeering activity. *Id.* at 143. We emphasized, however, that the sole proprietorship at issue in *McCullough* was a business with an identity distinct and separate from that of the defendant himself. *Id.* at 144. The defendant "had several people working for him; this made his company an enterprise, and not just a one-man band." *Id.* "[I]f the sole proprietorship were strictly a one-man show," on the other hand, we noted that *Haroco* would preclude liability for the defendant under section 1962(c). *Id.*

Our holding in *Haroco* governs the present case.

■ There is a serious question whether even the *McCullough* view of Section 1962(c) would sustain Count One. Yonan is a sole practitioner with only a secretary to assist him. What the government argues is that a lawyer who is undisputedly a "one-man show" or "one-man band," practicing in his own name (not as a professional corporation) and using no assumed name (the latter factor was present in *McCullough*), is magically transformed, by the act of hiring a secretary, into an "enterprise" by which he in turn becomes "employed" or with which he in turn becomes "associated." Any such notion would seem to stretch *McCullough*'s already attenuated extension of Section 1962(c) beyond the breaking point. There is a meaningful difference—one of kind rather than degree—

between a law practice, in which only the sole practitioner lawyer may render services directly to clients (so the secretary's clerical services do not create "a business with an identity distinct and separate from that of the defendant himself," *McCullough,* 757 F.2d at 144), and a business in which others too may and do carry on the business activity, though the entrepreneur has chosen a sole proprietorship form of organization (the situation *McCullough, id.* found sufficient for Section 1962(c) liability). Though it is always risky to predict what a Court of Appeals is likely to do, the most rational answer would seem that Yonan (like DiCaro) would be controlled by *Haroco* and not by *McCullough.*

But even were that not the case, Count One must fall. Were the 1985 *McCullough* reading of the statute extended to sweep up Yonan's 1980 conduct, what would be most significant for current purposes is not whether the surprising *McCullough* holding is right or wrong, but rather the very fact that it *is* so surprising.

American jurisprudence has long distinguished between criminal and civil liability in the extent to which the law insists on predictability as a condition of such liability. That distinction may perhaps not commend itself to those to whom no logical distinction exists between property interests (the money at stake in a civil action) and liberty interests (the potential of imprisonment in a criminal prosecution), but it exists nonetheless. It is one thing for a court to announce a defendant may be mulcted in damages by a novel and surprising reading of RICO, but it is quite another to render the same defendant vulnerable to a prison term.

As a Due Process Clause restriction on Congress, *United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954) put the proposition this way:

The constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the stat-

ute. The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.

And as a like restraint on judicial inventiveness, *Bouie v. City of Columbia*, 378 U.S. 347, 352–54, 84 S.Ct. 1697, 1701–03, 12 L.Ed.2d 894 (1964) announced:

> There can be no doubt that a deprivation of the right of fair warning can result not only from vague statutory language but also from an unforeseeable and retroactive judicial expansion of narrow and precise statutory language. As the Court recognized in *Pierce v. United States*, 314 U.S. 306, 311, [62 S.Ct. 237, 240, 86 L.Ed. 226], "judicial enlargement of a criminal Act by interpretation is at war with a fundamental concept of the common law that crimes must be defined with appropriate definiteness." Even where vague statutes are concerned, it has been pointed out that the vice in such an enactment cannot "be cured in a given case by a construction in that very case placing valid limits on the statute," for
>
>> "the objection of vagueness is twofold: inadequate guidance to the individual whose conduct is regulated, and inadequate guidance to the triers of fact. The former objection could not be cured retrospectively by a ruling either of the trial court or the appellate court, though it might be cured for the future by an authoritative judicial gloss...." Freund, The Supreme Court and Civil Liberties, 4 Vand.L. Rev. 533, 541 (1951).

See Amsterdam, Note, 109 U.Pa.L.Rev. 67, 73–74, n. 34. If this view is valid in the case of a judicial construction which adds a "clarifying gloss" to a vague statute, *id.*, at 73, making it narrower or more definite than its language indicates, it must be *a fortiori* so where the construction unexpectedly broadens a statute which on its face had been definite and precise. Indeed, an unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an *ex post facto* law, such as Art. I, § 10, of the Constitution forbids.

An *ex post facto* law has been defined by this Court as one "that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action," or "that *aggravates* a *crime*, or makes it *greater* than it was, when committed." *Calder v. Bull*, 3 Dall. (3 U.S.) 386, 390, 1 L.Ed. 648. If a state legislature is barred by the *Ex Post Facto* Clause from passing such a law, it must follow that a State Supreme Court is barred by the Due Process Clause from achieving precisely the same result by judicial construction. Cf. *Smith v. Cahoon*, 283 U.S. 553, 565, 51 S.Ct. 582, 586, 75 L.Ed. 1264. The fundamental principle that "the required criminal law must have existed when the conduct in issue occurred," Hall, General Principles of Criminal Law (2d ed. 1960), at 58–59, must apply to bar retroactive criminal prohibitions emanating from courts as well as from legislatures. If a judicial construction of a criminal statute is "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue," it must not be given retroactive effect. *Id.*, at 61.

No reasoned distinction may be made between a state supreme court that so enlarges a state criminal statute and a federal Court of Appeals (or even the United States Supreme Court) that does the same to a federal criminal statute. *Marks v. United States*, 430 U.S. 188, 191–92, 97 S.Ct. 990, 992–93, 51 L.Ed.2d 260 (1977) (citing to the state-statute-invalidating decisions in *Bouie* and in *Rabe v. Washington*, 405 U.S. 313, 92 S.Ct. 993, 31 L.Ed.2d 258 (1972) (per curiam)) confirmed that obvious proposition:

> The *Ex Post Facto* Clause is a limitation upon the powers of the Legislature, see *Calder v. Bull*, 3 Dall. [ (3 U.S.) ] 386 [1 L.Ed. 648] (1798), and does not of its own force apply to the Judicial Branch of government. *Frank v. Mangum*, 237 U.S. 309, 344 [35 S.Ct. 582, 594, 59 L.Ed. 969] (1915). But the principle on which the Clause is based—the notion that per-

sons have a right to fair warning of that conduct which will give rise to criminal penalties—is fundamental to our concept of constitutional liberty. See *United States v. Harriss,* 347 U.S. 612, 617 [74 S.Ct. 808, 811–12, 98 L.Ed. 989] (1954); *Lanzetta v. New Jersey,* 306 U.S. 451, 453 [59 S.Ct. 618, 619, 83 L.Ed 888] (1939). As such, that right is protected against judicial action by the Due Process Clause of the Fifth Amendment.

Much the same point was made by this Court in *United States ex rel. Reed v. Lane,* 571 F.Supp. 530, 532 (N.D.Ill.1983) (emphasis in original, quotation from *Harriss* omitted) in the context of a statute rather than of an unexpected judicial gloss:

> Essentially Reed relies on the principle that due process requires a person to be fairly apprised of criminal consequences *at the time he acts.* . . . If such notice is not fairly given by a statute, that statute is deemed unconstitutionally vague under the standard of *United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954). . . .

Of course every such argument relies on a fiction: the notion that a person bent on criminal activity is indeed aware of what the law provides, as though the potential murderer carries a copy of the Illinois Criminal Code with him (or has it committed to memory). But it is a necessary fiction if the concept of *mens rea* is not to be subverted. This Court then

must look at what Reed was fairly apprised of at the time he was confronted with the decision of how to act in the face of Hall's menace to his own life. That decision was affirmed by our Court of Appeals on precisely that ground, 759 F.2d 618, 621–22 (7th Cir.1985).

There is no gainsaying *McCullough* was unforeseeable in any rational sense.[5] It cited no authority at all for its freewheeling analysis.[6] Before *McCullough* the established (and sensible) judicial construction of RICO was that the "person" and the "enterprise" in Section 1962(c) could not be the same. *Haroco,* 747 F.2d at 399–402 (approving this Court's reading of the statute in *Parnes v. Heinold Commodities, Inc.,* 548 F.Supp. 20, 23–24 (N.D.Ill. 1982)), *aff'd per curiam,* —— U.S. ——, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985). There is no reasonable way in which Yonan, acting in 1980, could have anticipated the conduct charged in Count One would be criminal under Section 1962(c)—no reasonable way in which he could have had the *mens rea* proscribed by the statute's literal meaning or by its reasonable meaning without the *McCullough* gloss.[7]

In sum, Count One cannot be sustained either (1) because it does not charge an offense under Section 1962(c) even with the *McCullough* gloss or (2) if it does, because it is fatally deficient in due process terms. Yonan's motion for its dismissal is granted.

**5.** This discussion assumes *McCullough* is a correct reading of Section 1962(c)—a question as to which this Court is unregenerate but must bow to higher authority even if it views that authority as mistaken.

**6.** In its current briefing the United States points to pre-*McCullough* cases that hold an individual can be an "enterprise" in RICO terms. Of course that is no surprise—Section 1961(4) says so literally. But it is the wrong issue: What was unforeseeable for purposes that control this case was not the individual sole proprietor as "enterprise," or the individual sole proprietor as "person" (a tautology as well as a literal reading of Section 1961(3)), but rather the bizarre idea the individual qua "person" could be "associated with" or "employed by" *himself* qua "enterprise," thus meeting the test for Section 1962(c) liability. It is of course too late to speculate

whether the Court of Appeals would have reached the same result had that question been posed to it in the first instance as a matter of *criminal* responsibility and not (as in *McCullough*) as a matter of civil liability.

**7.** *Haroco,* 747 F.2d at 399 identified *United States v. Hartley,* 678 F.2d 961, 987–90 (11th Cir.1982), *cert. denied,* 459 U.S. 1170, 1183, 103 S.Ct. 815, 834, 74 L.Ed.2d 1014, 1027 (1983) as a maverick decision that had "held that the corporation at the center of a fraudulent scheme could be both the person and the enterprise under section 1962(c)." Again what is significant is not the unsoundness of that opinion, but the fact its extraordinary construction of the language of the statute—which reads so differently—came well after 1980 and could not reasonably have been anticipated at that earlier date.

*Count Two: Section 1962(a)*

Count Two poses a different problem and (perhaps not surprisingly) comes to a different end. It charges Yonan with having received income derived from a "pattern of racketeering activity" (the triggering device for all RICO responsibility) and having "used and invested"[8] that income and its proceeds "in the establishment and operation" of Yonan's same sole proprietorship—again charged to be an "enterprise." That is said to bring into play Section 1962(a):

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

At the same time *Haroco,* 747 F.2d at 400–01 subscribed to this Court's *Parnes* reading of Section 1962(c), our Court of Appeals announced in dictum a different view of Section 1962(a) (*id.* at 402):

> However, a corporation-enterprise may be held liable under subsection (a) when the corporation is also a perpetrator. As we parse subsection (a), a "person" (such as a corporation-enterprise) acts unlawfully if it receives income derived directly or indirectly from a pattern of racketeering activity in which the person has participated as a principal within the meaning of 18 U.S.C. § 2, and if the person uses the income in the establishment or *operation* of an enterprise affecting commerce. Subsection (a) does not contain any of the language in subsection (c) which suggests that the liable person

and the enterprise must be separate. Under subsection (a), therefore, the liable person may be a corporation using the proceeds of a pattern of racketeering activity in its operations. This approach to subsection (a) thus makes the corporation-enterprise liable under RICO when the corporation is actually the direct or indirect beneficiary of the pattern of racketeering activity, but not when it is merely the victim, prize, or passive instrument of racketeering. This result is in accord with the primary purpose of RICO, which, after all, is to reach those who ultimately profit from racketeering, not those who are victimized by it.

*Haroco* (like *McCullough* after it) cited no authority for that reading, and neither the government's memorandum nor this Court's own research has uncovered any prior case—and certainly none before 1980—announcing or supporting such a reading.

As the Count One discussion in this opinion reflects, however, that absence of prior precedent is not controlling. Though it might be odd to speak of an individual's "invest[ing]" in himself,[9] the terms "invest" and "use" appear in Section 1962(a) in the disjunctive (see n. 8). And there is nothing unreasonable or surprising (remembering that an individual doing business in sole proprietorship form can by definition be an "enterprise" for RICO purposes) in a literal reading of the alternative language drawn directly from Section 1962(a):

> It shall be unlawful for any person who has received any income derived ... from a pattern of racketeering activity ... to use ... any part of such income, or the proceeds of such income, in ...

---

8. Like the phrase next quoted in the text ("establishment and operation"), the indictment charges in the conjunctive even though the statute reads in the disjunctive. It is a familiar rule that an indictment "may allege commission of the offense by all the acts mentioned if it uses the conjunctive 'and' where the statute uses the disjunctive 'or.'" 1 Wright, *Federal Practice and Procedure: Criminal 2d* § 125, at 373 (1982). Consistently with the statute, the government is

not required to prove both branches of the conjunctive charge beyond a reasonable doubt to obtain a conviction. Instead, conviction may be based on proof beyond a reasonable doubt of the facts represented by either of the disjunctive alternatives.

9. See *Cashco Oil Co. v. Moses,* 605 F.Supp. 70, 71 (N.D.Ill.1985).

the ... operation of, any enterprise [his sole proprietorship] which is engaged in, or the activities of which affect, interstate ... commerce.

■ Certainly Congress could rationally have decided an individual who engages in a "pattern of racketeering activity" and puts his or her ill-gotten gains to work in his or her interstate-commerce-affecting business (a sole proprietorship) should be criminally responsible under federal law, while the same person who puts the same dollars into flashy sportscars should not. That concept does not require any notion of the individual's being "employed by" or "associated with" the business. It does not war with the normal meaning of the words used, and the portion of the statute quoted in the preceding paragraph could rationally have been expected in 1980 to embrace the conduct charged to Yonan in Count Two. That is enough for due process purposes.

As to Count Two, that leaves only the "pattern of racketeering activity" question, as to which Yonan Mem. 16–17 seeks to rely on this Court's opinion in *Northern Trust Bank/O'Hare, N.A. v. Inryco, Inc.*, 615 F.Supp. 828 (N.D.Ill.1985). But Count Two incorporates the substantive allegations of Count One, and paragraph 4 of the latter count charges Yonan with these multiple acts of bribery:

(1) On or about September 22, 1980 defendant CYRUS YONAN, JR. gave $100 to James Costello to give to Terrence Hake to influence the handling and disposition of *People v. Constance Warr.*

(2) On or about October 14, 1980, defendant CYRUS YONAN, JR. gave $300 to Terrence Hake to influence the handling and disposition of *People v. Willie Balls, People v. Constance Warr* and *People v. John Gilbert.*

(3) On or about November 7, 1980, defendant CYRUS YONAN, JR. gave $50 to Terrence Hake to influence the release of a car seized in connection with the arrest of Roosevelt Mitchell.

(4) On or about November 10, 1980, defendant CYRUS YONAN, JR. gave $100 to Terrence Hake to influence the handling and disposition of *People v. Willie Booker.*

(5) On or about November 13, 1980, defendant CYRUS YONAN, JR. gave $100 to Terrence Hake to influence the handling and disposition of *People v. Henry Talbert.*

(6) On or about November 26, 1980, defendant CYRUS YONAN, JR. gave Terrence Hake $100 to influence the handling and disposition of *People v. James Jones, People v. Thomas McCreary* and *People v. Willie Blue.*

(7) On or about December 1, 1980, defendant CYRUS YONAN, JR. offered money to Terrance [sic] Hake to influence the handling and disposition of *People v. Alan Wyman.*

True enough, Yonan is alleged to have made all his payments to one person—Terrence Hake, who proved to be an undercover agent. But the payments were assertedly made to fix a whole series of criminal cases in the Cook County Circuit Court. Those separate acts of bribery to fix ten separate cases, involving as many different criminal defendants, contrast sharply with the mailing of more than one letter to implement a single kickback scheme (the situation in *Inryco*). Surely what Yonan is charged with can fairly be read as a "pattern" within the very language of *Inryco*, 615 F.Supp. at 831 (emphasis in original) quoted by Yonan Mem. 16:

True enough, "pattern" connotes similarity, hence the cases' proper emphasis on relatedness of the constituent acts. But "pattern" also connotes a multiplicity of events: Surely the continuity inherent in the term presumes repeated criminal *activity*, not merely repeated *acts* to carry out the *same* criminal activity. It places a real strain on the language to speak of a single fraudulent effort, implemented by several fraudulent acts, as a "pattern of racketeering activity."

Count Two thus stands in a very different posture from Count One. Yonan's motion to dismiss Count Two is denied.

*Counts Three through Ten: Section 1341*

Finally, Yonan is charged in Counts Three through Ten with eight violations of Section 1341, the federal mail fraud statute. Those charges are couched in what has become the all-too-familiar "intangible rights" theory: an alleged scheme to defraud:

(a) Cook County and its citizens, its public officials, and its public employees of their right to have the business of the Cook County Circuit Court conducted honestly, fairly, impartially, free form [sic] corruption, collusion, partiality, dishonesty, conflict of interest, bribery and fraud, and in accordance with the laws of the State of Illinois.

(b) Cook County and its citizens of their right to have criminal cases prosecuted and decided free from the influence of corruption, collusion, partiality, dishonesty, conflict of interest, bribery and fraud in accordance with the laws of the State of Illinois.

(c) The Cook County Circuit Court and the citizens of Cook County and of Chicago of their right to the loyal, faithful and honest services of certain public officials in the performance of acts related to their public employment.

Yonan's scheme is charged to have embraced the payment of bribes to prosecutor Terrence Hake ("Hake"), assigned to Circuit Court Branch 57, to fix cases involving Yonan's clients. Federal jurisdiction hinges on Yonan's, on the eight occasions specified in the mail fraud counts, having caused the Circuit Court to mail him bail bond refund checks (the "Refunds") for the cases involved in the fix efforts.[10]

■ Yonan launches two attacks on the Section 1341 counts:

1. He says he cannot be liable under the "intangible rights" doctrine because he is not a fiduciary of the public and the asserted scheme involved no such fiduciary.

2. He argues the mailing of the Refunds was not "for the purpose of executing" the claimed scheme.

Both onslaughts are unsuccessful, leaving the mail fraud portion of the indictment intact.

*1. "Intangible Rights" Doctrine*

Yonan is not charged with defrauding anyone of tangible property. Instead the indictment asserts he schemed to deprive the public of what has been called its "intangible right" to fair and honest government. See, e.g., *United States v. Alexander*, 741 F.2d 962, 964 (7th Cir.1984); *United States v. Margiotta*, 688 F.2d 108, 121 (2d Cir.1982), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983).

Yonan seeks to focus on an essential aspect of the "intangible rights" concept exemplified by *Alexander*, 741 F.2d at 964:

A scheme to obtain tangible property is cognizable under the mail fraud statute regardless of the relationship between the defendant and his victim. In contrast, an intangible rights scheme is only cognizable when at least one of the schemers has a fiduciary relationship with the defrauded person or entity.

Because Hake (unknown to Yonan) was an undercover agent, only pretending to be a corrupt prosecutor (Government Mem. 4), Yonan urges Hake could not be a "schemer" in the real sense. And because Hake was the only one involved in the alleged scheme who might be characterized as having a "fiduciary relationship" with the defrauded public, Yonan says the just-quoted *Alexander* test has not been met as a matter of law. To evaluate that argument, it is profitable to engage in a brief review of the fact patterns in relevant "intangible rights" cases.

**10.** Section 1341 provides in relevant part: Whoever, having devised ... any scheme or artifice to defraud, ... for the purpose of executing such scheme or artifice or attempting so to do ... knowingly causes to be deliv- ered by mail according to the direction thereon, ... any ... matter of thing [whatever to be sent or delivered by the Postal Service], shall be fined not more than $1,000 or imprisoned not more than five years, or both.

In *United States v. Freedman*, 568 F.Supp. 450 (N.D.Ill.1983) this Court dismissed Section 1341 counts against private attorneys who had allegedly taken money from their clients on the representation they would use the money to bribe the judge handling the clients' cases. But the lawyers were actually engaged in their own "ripoff" for their own benefit: There was no allegation they had in fact bribed or attempted to bribe any judge. This Court held (*id.* at 452–56):

    1.   Private attorneys are not, by virtue of their ethical obligations or status as "officers of the court," fiduciaries of the public.

    2.   Persons who are not actual participants in the operations of government (though that is a functional test and not one of mere definition) are not public fiduciaries.

Consequently attorneys Freedman and Moore (his codefendant) were not fiduciaries of the public and were not indictable under an intangible rights application of Section 1341.

*Alexander* (also involving a private attorney) approved the *Freedman* line of analysis in the language quoted on page 730 of this opinion. But *Alexander* then made it clear the mere fact of the defendant lawyer's non-public-fiduciary status would not insulate him from intangible rights mail fraud conviction if his scheme included someone who *was* a public fiduciary. Alexander was in fact alleged and proved to have schemed with three employees of the Cook County Board of [Tax] Appeals to obtain fraudulent reductions of his clients' assessments. While confirming Alexander was not himself a fiduciary of the public, the court said (741 F.2d at 964)(citation omitted):

There can be no doubt that a non-fiduciary who schemes with a fiduciary to deprive the victim of intangible rights is subject to prosecution under the mail fraud statute .... More recently, the court in *Freedman* observed that, "there is no doubt a private attorney who uses the mails to carry out a scheme to defraud involving the actual bribery of public officials is indictable under Section 1341 on an 'intangible rights' theory." 568 F.Supp. at 453.

Alexander's indictment characterized the Board of Appeals employees as his "co-schemers" who in fact "fraudulently reduced assessments" (741 F.2d at 965). Those facts were adequate to support private attorney Alexander's mail fraud indictment and conviction (*id.*).

*United States v. Kaye*, 586 F.Supp. 1395 (N.D.Ill.1984) ("*Kaye I*") and 593 F.Supp. 193 (N.D. Ill.1984) ("*Kaye II*") presented this Court with a fact pattern that mixed elements of *Freedman* and *Alexander*. Though Yonan seeks to rely heavily on *Kaye II* in attacking his own mail fraud counts, an analysis of *Kaye I* and *Kaye II* affords Yonan no comfort.

Kaye was a part-time deputy sheriff whose duties included attendance at court proceedings. *Kaye I*, 586 F.Supp. at 1403. One of Kaye's schemes was to take money from litigants while falsely representing he would use the money to bribe judges—what this Court described as "a cottage industry of his own." *Kaye II*, 593 F.Supp. at 196.

Without doubt Kaye was a public fiduciary. But his Section 1341 indictment had two flaws, the first apparent from the indictment itself and the second emerging after trial:

    1.   Absent any showing Kaye actually attempted to pass the money to the judges, he "could not have deprived the public of its right to honest judges." *Kaye I*, 586 F.Supp. at 1403.

    2.   Absent proof Kaye used his position as deputy sheriff to solicit the bribes, his acceptance of money from litigants was not a breach of his fiduciary duty *as a deputy sheriff*. *Kaye II*, 593 F.Supp. at 196.

That first defect plainly concerned the nature of Kaye's scheme, while the second concerned the scope of Kaye's own fiduciary obligations to the public. It is with that distinction in mind that this Court's

*Kaye II* opinion must be read to determine its impact on Yonan.

While Counts Three through Ten of Yonan's indictment refer only to "a prosecutor in Branch 57," the government's memorandum acknowledges that was Hake, the Assistant State's Attorney referred to in Counts One and Two. As already said, Hake was an undercover agent rather than a venal prosecutor. When he took the money from Yonan, Hake did not breach any fiduciary duty to the public. Instead he was helping to catch Yonan.

Under *Alexander* (and *Freedman*), private attorney Yonan is not himself a public fiduciary. If the earlier-quoted language from *Alexander* were to be taken literally as a limitation on Section 1341, that would mean Yonan must have "schemed" with a public fiduciary to come within intangible right mail fraud. And in that respect Yonan accurately says this case, unlike *Alexander*, involved no scheming fiduciary: Hake clearly did not have any intent to defraud the public.

In the same vein, Yonan cites a sentence from *Kaye II* in support of his argument the fiduciary must himself be corrupt. There, after this Court had quoted the *Alexander* language that an intangible rights scheme "is only cognizable when at least one of the schemers has a fiduciary relationship with the defrauded person or entity," it added (593 F.Supp. at 196)(emphasis in original):

And that necessarily means the schemer must have been shown to have *breached* that fiduciary relationship.

But as should be clear from the prior discussion of *Kaye I* and *Kaye II*, that language spoke only of whether *Kaye* had breached *his own* fiduciary duty as a deputy sheriff by taking bribes. If a public official has violated no fiduciary duty, *he* or *she* has committed no intangible-rights fraud cognizable under Section 1341—that much is elementary. But Section 1341 speaks of an *individual's* devising a

scheme, not of two or more persons entering into a conspiracy—and nothing in *Alexander* or *Kaye II* can be read as somehow amending the statute to require a conspiracy between a non-fiduciary and a fiduciary before the scheming *non-fiduciary* may be held criminally responsible.

That distinction is made even more plain by an examination of the scheme charged here. It involved the *giving* and *offering* of money to a prosecutor with a corrupt intention on the giver's (Yonan's) part. Nothing in Section 1341 (or the indictment) also requires the connivance of the public official, just as the Illinois bribery statute (Ill.Rev.Stat. ch. 38, § 33–1) charged in Counts One and Two looks only to the intent of the briber and not of the recipient:

A person commits bribery when:

. . . . .

(b) With intent to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness, he promises or tenders to one whom he believes to be a public officer, public employee, juror or witness, any property or personal advantage which a public officer, public employee, juror or witness would not be authorized by law to accept

. . . .

From the perspective of the bribe *giver* (or in this case, the non-fiduciary schemer), the crime is complete when the bribe is tendered,[11] whether (in the case of either the bribe or the scheme) it is then rejected, or accepted with a like fraudulent intent, or "accepted" by an undercover agent lacking the mens rea of a bribe-taker or a co-schemer. By contrast, *Kaye II* involved the criminal responsibility of a bribe *taker*, who could breach his fiduciary duty to the public only if he or she had the requisite mens rea. Neither the quoted sentence from *Kaye II* nor that quoted earlier from *Alexander* can carry the baggage Yonan tries to load onto the language. There is

---

**11.** More precisely, the Section 1341 crime is complete when the scheme is "devised" and there is a mailing "for the purpose of executing"

the scheme (a requirement discussed later in this opinion).

no need for the government to charge or prove Yonan had a coschemer who breached his fiduciary duty to the public.

For essentially the same reason, Yonan's citations of cases dealing with principles of conspiracy and of aiding and abetting are off the mark. Each of those subjects requires only brief discussion.

As for the first of those topics, it is true a few cases have said "conspiracy principles apply" in multiparty mail fraud schemes, even absent a conspiracy count. See, e.g., *United States v. Dick,* 744 F.2d 546, 552 (7th Cir.1984); *United States v. Wormick,* 709 F.2d 454, 461 (7th Cir.1983). And by definition "conspiracy" requires an agreement to violate the law. But that language too must be read in context. In each of *Dick* and *Wormick* a co-schemer who did not actually mail anything was held accountable for the mailings of others because there *was* an agreement among the co-schemers. Neither case modifies Section 1341 to hold such an agreement is required before a "scheme" can even come into being.

Nor is the aiding-and-abetting analogy proposed by Yonan apposite. Hake was not the "principal" of this alleged scheme—Yonan was. Intangible rights convictions do not require the public fiduciary to be the principal, because the scheme (like bribery) may originate with the corrupt offeror. If it does (as charged here), the offeror does not "aid and abet" the offeree. Yonan simply reads *Freedman* and *Alexander* incorrectly on this score. Neither case addressed the degree of culpability required of the public fiduciary, because no fiduciary was present in *Freedman* and those involved in *Alexander* were concededly culpable. Neither case requires the public fiduciary to occupy the role of a principal.

In sum, Yonan's first challenge to Counts Three through Ten fails. Analyzed in terms of the issues they actually spoke to, neither *Alexander* nor *Kaye II* (much less *Freedman* or *Kaye I*) requires an intangible rights scheme to include actual bribery of a *corrupt* public fiduciary. Yonan is charged with having devised the scheme to defraud. Nothing more (besides the mailings themselves) is required to support the indictment.

*2. Mailing "for the Purpose of Executing Such Scheme"*

■ Yonan also attacks the other element of a Section 1341 charge—that the mailing be "for the purpose of executing such scheme." That language requires more than a merely incidental connection. As *United States v. Maze,* 414 U.S. 395, 405, 94 S.Ct. 645, 651, 38 L.Ed.2d 603 (1974) (footnote omitted) said:

Congress could have drafted the mail fraud statute so as to require only that the mails be in fact used as a result of the fraudulent scheme. But it did not do this; instead, it required that the use of the mails be "for the purpose of executing such scheme or artifice ...."

*United States v. Cina,* 699 F.2d 853, 861 (7th Cir.), *cert. denied,* 464 U.S. 991, 104 S.Ct. 481, 78 L.Ed.2d 679 (1983) put the same thought this way (quoting *United States v. Brown,* 583 F.2d 659, 664 (3d Cir.1978)):

The completion of the scheme must depend in some way upon the mailings charged.

Yonan would have it the mailing of the Refunds did not bear that relationship to the alleged scheme. But though he seeks to distinguish *United States v. Murphy,* 768 F.2d 1518 (7th Cir.1985), that case controls here. *Murphy* also premised federal mail fraud jurisdiction on the mailing of bail bond refunds to lawyers (in that case they had paid bribes to Judge Murphy). It is worth quoting the opinion at some length (*id.* at 1529–30):

The mail fraud counts were based on the mailings of the [Refunds]. Murphy says that these mailings were not part of any fraud committed against the people of Cook County. The [Refunds] were matters between the clients and the lawyers; he had nothing to do with them. He relies on *United States v. Maze,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), and *Parr v. United States,* 363 U.S. 370,

80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960). In each of these cases the Court held that mailings that merely settle accounts among the victims after the fraud had taken place do not bring the fraud within the mail fraud statute.

The jury was entitled to conclude, however, that the mailings of the [Refunds] were integral to the offense. Murphy received payoffs. Lawyers paid the bribes in order to secure their own profits, and those profits came by way of the [Refunds]. In the morning the lawyers would fix cases (or hustle clients), and Murphy would release the [Refunds] to the lawyers. In the afternoon the lawyers would pay the judge for services rendered. The next day the process would be repeated. In *Pereira v. United States*, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954), a scheme under which the defendant induced his spouse to send money through the mail, the defendant absconded with the loot, which the Court held violated the mail fraud statute. The mails carried the money to be used in the offense. Here it was the anticipation of receiving the [Refunds] in a given case (and future cases) that both financed the bribes and made the scheme profitable. It may be that Murphy did not care whether the lawyers picked up checks in person or whether the court sent them out by messenger instead of mail. But the statute does not demand that the mail (as opposed to some other form of delivery) be essential to the offense. It is enough if use of the mail is an ordinary or expectable event in the course of the scheme and the mailings further the scheme. *United States v. Lea*, 618 F.2d 426, 430 (7th Cir.), *cert. denied*, 449 U.S. 823, 101 S.Ct. 82, 66 L.Ed.2d 25 (1980). *Murphy* teaches the mailing of Refunds to the attorney—a normal practice in the Circuit Court as a means of securing the attorney's fee—need not itself be fraudulent. Judge Murphy's scheme required payments to him, for the Refunds "financed the bribes." In Yonan's alleged scheme the connection was even more direct, for the Refunds were the very goal of the scheme. Thus Count Three ¶ 5 alleges:

> It was further a part of the scheme to defraud that CYRUS YONAN, JR., did obtain money and other benefits for himself in the form of Cash Bond Refund ... checks and additional fees by corruptly disposing of criminal cases pending against his clients.

And whether or not that allegation is made,[12] a conviction would be sustainable so long as the proof at trial were to establish such a link (see *Murphy*, 768 F.2d at 1529).

Indeed, the case against Yonan (if proved, of course) is a stronger one than Judge Murphy's. In *Murphy* the jury was required to find Judge Murphy authorized payment of Refunds (involving no direct benefit to him) as a means of funding the bribes he expected to receive. By contrast, the receipt of the Refunds directly completed Yonan's alleged scheme to profit from corruption. *Cina*, 699 F.2d at 861. Indeed, an even shorter answer is found in *Murphy*'s holding, 768 F.2d at 1530:

> [T]he statute does not demand that the mail ... be essential to the offense. It is enough if use of the mail is an ordinary or expectable event in the course of the scheme and the mailings further the scheme.

On the indictment's allegations the mailing of Refunds was "knowingly caused" by Yonan "for the purpose of executing the scheme to defraud."

Nor is Yonan assisted by his attempted reliance on *Maze*, 414 U.S. at 401–02, 94 S.Ct. at 649–50 (a credit-card fraud case) and *Parr*, 363 U.S. at 390–91, 80 S.Ct. at

---

**12.** It is puzzling that Counts Four through Ten incorporate by reference only paragraphs 1 through 4 (and not paragraph 5) of Count Three. Given the checkered history of the indictment, it seems very possible that represents an oversight. But the omission (which has gone unmentioned by Yonan) is not critical, for the first four paragraphs sufficiently charge a scheme to defraud, and the last paragraph of each count charges the specified mailing was intended to execute the scheme.

1183–84 (a real-estate-tax fraud case). Each was critically different from the present situation.

Thus, as *Maze,* 414 U.S. at 402, 94 S.Ct. at 649–50 explained, the charged mailings there were "directed to the end of adjusting accounts" among the victims of the scheme and provided no benefit to the defendant:

> [T]here is no indication that the success of his scheme depended in any way on which of his victims ultimately bore the loss.

In contrast, success for Yonan *was* the very receipt of the Refunds themselves.[13]

Similarly *Parr,* 363 U.S. at 391, 80 S.Ct. at 1183–84, said this of the mailings charged there (tax statements and receipts the defendants were required by state law to mail):

> [I]t cannot be said that mailings made or caused to be made under the imperative command of duty imposed by state law are criminal under the federal mail fraud statute, even though some of those who are so required to do the mailing ... plan to steal, when or after received, some indefinite part of [the money].

There is no suggestion here that any law required the mailings to Yonan; but even if it were otherwise, it must be remembered it was Yonan's own asserted scheme that was intended to put into motion the fraudulent case dispositions that triggered the Refunds. That is enough for criminal responsibility.[14]

In sum, Yonan reads the Section 1341 mailing requirement too narrowly. There is no doubt the charged mailings were "for the purpose of executing" the scheme. And on the indictment's allegations, Yonan "caused" the mailings in the sense defined by *United States v. McManigal,* 708 F.2d 276, 281 (7th Cir.1983):

To use the mails in furtherance of a scheme requires only that a defendant commit an act with knowledge that the use of the mails will follow in the ordinary course of business, or commit an act when the use of the mails can reasonably be foreseen.

Yonan's second line of attack on the mail fraud counts, like his first, is unsuccessful.

### Conclusion

For the reasons this opinion has reflected, Count One of the indictment is dismissed, but all the other counts survive. On or before November 20, 1985 Yonan's counsel is directed to file a statement as to which (if any) other motions, previously filed before Judge McMillen and not yet ruled upon, still require disposition in light of these rulings.

---

**13.** See also the discussion of *Maze* in *United States v. Isaacs,* 493 F.2d 1124, 1151 (7th Cir.), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974):

> Maze had received the full benefit of each fraudulent use of the stolen credit card before the transmittal of the invoices by mail to the Louisville bank.

**14.** Yonan's case could not even arguably parallel *Parr* unless Yonan were required by law to request the mailing of the Refunds. And of course he was not.