**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Peter C. ALEXANDER,
Defendant-Appellant.**

**No. 83–1648.**

United States Court of Appeals,
Seventh Circuit.

Argued April 12, 1984.

Decided Aug. 13, 1984.

Rehearing and Rehearing En Banc
Denied Nov. 28, 1984.

Jerry B. Kurz, Hall & Kurtz, Chicago, Ill., for defendant-appellant.

Andrea L. Davis, Asst. U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before PELL and COFFEY, Circuit Judges, and NICHOLS, Senior Circuit Judge.*

PELL, Circuit Judge.

Defendant Peter Alexander was an attorney representing clients before the Cook County Board of Appeals, which reviews real estate assessments made by the Cook County Assessor's Office for purposes of determining the real estate tax owed. Defendant filed complaints before the Board on behalf of clients dissatisfied with their property tax assessments. Assessments are substantially based on subjective criteria and can affect large sums of money, so it should come as no surprise that several Board employees succumbed to the temptation of deciding cases on the basis of bribes paid by attorneys rather than on the merits of the complaint. Defendant's involvement in the bribery scheme resulted in conviction on 15 counts of mail fraud, 18 U.S.C. § 1341, and one count of racketeering in violation of 18 U.S.C. § 1962(c). The district court sentenced defendant to serve 30 days in a work release program, five years probation, and to forfeit $51,874.53 in legal fees. Defendant challenges both his conviction and the forfeiture order.[1]

I  Facts

Defendant is not the first participant in the bribery scheme to have his derelictions become the basis of an opinion by this court. The scheme has been discussed previously in *United States v. McManigal*, 708 F.2d 276 (7th Cir.), *vacated*, — U.S. —, 104 S.Ct. 419, 78 L.Ed.2d 355, *aff'd on remand*, 723 F.2d 580 (1983) and *United States v. Gorny*, 732 F.2d 597 (7th Cir. 1984). We will review the scheme so far as it pertains to defendant. Further information on the scheme can be found in *McManigal* and *Gorny*.

The Board was headed by two elected commissioners. During the time of the bribery scheme the commissioners were Seymour Zaban and Harry Semrow. The commissioners were obligated to review complaints after the taxpayer or his attorney presented his case to a hearing officer, who would prepare a file on the case. Because of the high volume of complaints, the commissioners' deputies had the same authority to act on complaints as the commissioners. The scheme involved Zaban's deputy, Donald Erskine, Semrow's deputies, Thomas Lavin and Robert Hosty, and James Woodlock, who was in charge of computer operations at the Board.

The scheme involved granting reductions in assessments in return for payments made by attorneys. A reduction could only be granted upon the concurrence of both commissioners, neither of whom were involved in the scheme. Both Erskine and Lavin would either forge the signature of their respective commissioners or sign their commissioner's name and subscript their own, as they were authorized to do. Erskine, Lavin, and Woodlock would keep the fraudulent files from being presented to the commissioners. Lavin left the Board in December 1977, and Hosty became Semrow's deputy. Arrangements were made so that Lavin could continue to forge Sem-

* Philip Nichols, Jr., Senior Circuit Judge of the Federal Circuit, is sitting by designation.

1. Although defendant filed a fifty page brief in this case presenting a number of issues supporting a claim for reversal, counsel chose to present only two of these in oral argument notwithstanding that the allotted time was substantially not utilized. Nonetheless, we will consider those issues that have any arguable merit.

row's signature, and Hosty agreed to sub-script Semrow's initials with his own on fraudulent files when necessary.

Defendant was one of five partners in the firm of Welfeld & Chaimson and was the partner responsible for the firm's real estate tax work. Defendant and Erskine were close personal friends, and defendant became involved in the scheme in 1976. The evidence revealed that defendant made payments to Erskine, Woodlock, and Hosty in return for fraudulent reductions.

## II  Sufficiency of the Indictment

### A.  Intangible Rights

Defendant challenges the sufficiency of the indictment to charge a violation of the mail fraud statute. In relevant part the mail fraud statute reads:

> Whoever, having devised ... any scheme or artifice to defraud ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service ... or knowingly causes to be delivered by mail ... any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1341.

■ Defendant presents to us two reasons why the indictment is insufficient. His principal claim is that the indictment alleged only fiduciary fraud, that is, a scheme to deprive the public of the honest services of public employees in the performance of their duties. A scheme to defraud the citizenry and government of an intangible right, such as honest service, can be contrasted with a scheme to obtain tangible property through fraud. A scheme to obtain tangible property is cognizable under the mail fraud statute regardless of the relationship between the defendant and his victim. In contrast, an intangible rights scheme is only cognizable when at least one of the schemers has a fiduciary relationship with the defrauded person or entity. *United States v. Margiotta*, 688 F.2d

108 (2d Cir.1982); *United States v. Freedman*, 568 F.Supp. 450 (N.D.Ill.1983). Defendant asserts that such a fiduciary relationship is missing from the indictment.

■ Defendant argues that he was not a fiduciary of the Board and that the indictment does not allege that any of his co-schemers were fiduciaries. We readily agree with defendant's claim that he, as a private attorney, was not a fiduciary of the Board. Defendant's second claim, however, is without merit. There can be no doubt that a non-fiduciary who schemes with a fiduciary to deprive the victim of intangible rights is subject to prosecution under the mail fraud statute. In *United States v. George*, 477 F.2d 508 (7th Cir. 1973), we upheld the conviction of a defendant who gave kickbacks to an employee of Zenith on the theory that Zenith was deprived of the honest services of the employee, although the defendant himself had no fiduciary relationship with Zenith. More recently, the court in *Freedman* observed that, "there is no doubt a private attorney who uses the mails to carry out a scheme to defraud involving the actual bribery of public officials is indictable under Section 1341 on an 'intangible rights' theory." 568 F.Supp. at 453.

The only question is whether the indictment alleged that defendant's co-schemers were public employees who had a fiduciary relationship with the Board. The indictment described the positions held by Erskine, Woodlock, and Hosty and charged that defendant "with other co-schemers both known and unknown" devised a scheme to defraud the Board of the honest services of Erskine, Woodlock, and Hosty. If this were all that the indictment charged the case might be analogous to *Freedman*, in which private attorneys were charged with "known and unknown" co-schemers in taking money from a client to bribe a judge. There was no allegation that the judge was bribed or knew anything about the scheme, and hence there was no basis for assuming that the judge was one of the known co-schemers. The court accordingly dismissed the indictment as insufficient un-

der an intangible rights theory. Here, however, the indictment charges that:

It was a further part of the scheme to defraud that in return for the bribes paid to Donald Erskine, James Woodlock and Robert Hosty by the defendant PETER C. ALEXANDER; *Erskine, Woodlock, Hosty and other co-schemers* fraudulently processed complaints filed at the Board of Appeals on behalf of the Welfeld & Chaimson firm. During the period relevant to this indictment, *the co-schemers Erskine, Woodlock, Hosty and others,* fraudulently reduced assessments in over 260 cases filed on behalf of the clients of Welfeld & Chaimson. (emphasis added)

It is clear that the indictment sufficiently alleges that the known co-schemers included Erskine, Woodlock, and Hosty, and that these men were public employees. Nothing more is required to indict defendant under an intangible rights theory.

B. Mailing in Furtherance of the Scheme

■ Defendant's second claim is that the district court erred in finding that the mailing of the fraudulently reduced tax bills to the clients of defendant was in furtherance of the scheme. The mail fraud statute requires that the mails be used "for the purpose of executing" the fraudulent scheme. 18 U.S.C. § 1341; *United States v. Maze,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974). Defendant claims that the mailing of the tax bills here did not further the bribery scheme, which defendant claims was accomplished once the files were altered. Defendant acknowledges that this claim has been rejected in *McManigal, United States v. Feinberg,* 535 F.2d 1004 (7th Cir.1976), *cert. denied,* 429 U.S. 929, 97 S.Ct. 337, 50 L.Ed.2d 300 and *United States v. Lavin,* 504 F.Supp. 1356 (N.D. Ill.1981), all of which involved prosecutions of employes of the Board and attorneys engaged in bribery at the Board. Defendant attempts to distinguish these cases by noting that in all of these cases there was proof that the legal fees, which were the

source of the bribes, were based on a percentage of the reduction and hence not paid until the tax bills were mailed to the clients. Here there was no proof that Welfeld & Chaimson's fees were dependent upon the client's receipt of the tax bill.

We considered an identical argument in *United States v. Gorny,* 732 F.2d 597 (7th Cir.1984). Gorny, who served as a deputy commissioner at the Board, also argued that without direct proof of a connection between the tax bills and the bribes his conviction for mail fraud could not stand. We rejected this narrow reading of *McManigal* and *Feinberg.*

While in the case before us the link between the amount of the tax savings and the amount of the bribe is not as direct as in *McManigal* and *Feinberg,* the government has presented a scenario of an ongoing scheme of payments and assessment reductions. It does not matter whether a particular payment preceded or followed a particular influenced action because notice from the tax bills was necessary to assure the bribers that their efforts had been rewarded and thus to induce them to make further payments. 732 F.2d at 602.

The Government here also presented evidence of an ongoing bribery scheme that would not have continued but for the satisfaction of the clients. Defendant can hardly argue that the end product of the bribery, the reduced tax bills, were mere surplusage that did nothing to further the scheme. This scenario is radically different from that presented in *United States v. Maze,* upon which defendant relies. In *Maze* defendant used stolen credit cards to purchase goods and services from hotels. The Government contended that the hotels' mailings of the invoices to the bank that issued the credit cards were in furtherance of defendant's scheme. The Court rejected this, observing that defendant "probably would have preferred to have the invoices misplaced by the various motel personnel and never mailed at all." 414 U.S. at 402, 94 S.Ct. at 649. In contrast with *Maze,* in which the mailings increased the probabili-

ty of detection of defendant's scheme, this case involves mailings that were the culmination of the scheme.[2]

### III  Admissibility of Hosty's Statements

■ The Government did not call Hosty to testify at trial, but did elicit from Erskine several statements Hosty made concerning payments by Welfeld & Chaimson. The court found that the Government sufficiently established that defendant and Hosty were both part of the scheme and that the statements were in furtherance of the scheme. The statements were thus admissible under the coconspirator exception to the hearsay rule. Fed.R.Evid. 801(d)(2)(E); *United States v. Santiago*, 582 F.2d 1128 (7th Cir.1978).

Defendant challenges the court's finding that the Government established the elements of the coconspirator exception. This claim is premised on defendant's challenge to Erskine's testimony regarding statements made by defendant. According to Erskine, defendant made a statement concerning paying Hosty $500. Defendant denied making this statement and now claims that Erskine's uncorroborated rendition of defendant's statement is not sufficient to establish that defendant and Hosty were coconspirators. Defendant's citation of *United States v. Fearn*, 589 F.2d 1316 (7th Cir.1978), in support of this proposition is unpersuasive. *Fearn* stands for the principle "that a *conviction* must rest upon firmer ground than the uncorroborated admission or confession of the accused." *Id.* at 1321 (emphasis added). The standard for establishing guilt, proof beyond a reasonable doubt, is not the standard for establishing the existence of a conspiracy for the purpose of establishing the admissibility of evidence, which is proof by a preponderance of the evidence. *United States v. Xheka*, 704 F.2d 974, 986 (7th Cir.1983),

*cert. denied,* ── U.S. ──, 104 S.Ct. 486, 78 L.Ed.2d 682 (1984). We can find no support for the claim that defendant's own admissions cannot establish the elements of the coconspirator exception and accordingly reject defendant's claim. We turn now to defendant's claim concerning the propriety of the forfeiture order.[3]

### IV  Forfeiture of Profits

■ Defendant challenges on a number of grounds the forfeiture order entered by the district court. Defendant's arguments based on the misconception that his conviction was improper or that there was insufficient evidence to establish the extent of his participation in the scheme are without merit and do not warrant any discussion. We will, however, discuss defendant's claim that the court improperly required forfeiture of all of the profits defendant derived from the scheme without a showing that those profits were in existence at the time of the conviction.

Under 18 U.S.C. § 1963(a), a defendant convicted of racketeering under 18 U.S.C. § 1962 is subject to imprisonment, a fine, and mandatory forfeiture of:

> (1) any interest he has acquired or maintained in violation of section 1962, and (2) any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which he has established, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962.

The Government sought forfeiture of defendant's legal fees earned through the bribery scheme under section 1963(a)(1), arguing that defendant's profits were an "interest he has acquired or maintained in violation of section 1962." The court agreed with the Government that "inter-

---

**2.** We note that this conclusion is bolstered by *United States v. Lavin*, 504 F.Supp. 1356 (N.D. Ill.1981), in which the court found that the mailings were necessary to complete the scheme as the indictment charged a scheme to defraud the citizens of Cook County of their right to have the business of the Board conducted honestly. Mailing tax bills was part of the Board's business and was affected by the bribery. An

identical charge was made here and an identical result is required.

**3.** We have considered defendant's claim that there was insufficient evidence to support his conviction for the counts based on his dealings with Hosty and find it to be without merit.

est" includes profits or proceeds and ordered forfeiture of defendant's fees.

Events subsequent to the district court's decision have demonstrated that the court was correct in its reading of "interest." However, we must re-examine the decisions of this court and the Supreme Court to determine a separate contention raised by defendant; are profits subject to forfeiture limited to those in defendant's possession at the time of conviction?

The district court entered the forfeiture order in April 1983. During the following May this court decided *United States v. McManigal,* 708 F.2d 276 (7th Cir.1983), *vacated,* —— U.S. ——, 104 S.Ct. 419, 78 L.Ed.2d 355, *aff'd on remand,* 723 F.2d 580 (1983). In *McManigal* we affirmed the conviction of another lawyer involved in bribery before the Board, but reversed the forfeiture of fees earned by the attorney. In *McManigal* the Government advanced two grounds in support of the forfeiture. The Government first claimed that profits earned through racketeering were an "interest" under section 1963(a)(1). We rejected this as an overly expansive reading of "interest." The Government alternatively contended that defendant's interest in the accounts receivable of the law firm was "an interest in ... [an] enterprise which he has established ... in violation of section 1962," and thus subject to forfeiture under section 1963(a)(2). After examining the language and purpose of the forfeiture provision we determined that "[a] defendant cannot be made to forfeit an interest he no longer possesses on conviction or indictment, either because he has voluntarily divested himself of the interest or because the interest has disappeared." 708 F.2d at 290.

After we decided *McManigal* the Supreme Court issued its opinion in *Russello v. United States,* —— U.S. ——, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983). *Russello* involved forfeiture of profits earned by an arsonist. The Court held that the profits were subject to forfeiture under section

1963(a)(1) as an "interest" acquired in violation of section 1962. The Court noted that, "The ordinary meaning of 'interest' surely encompasses a right to profits or proceeds." *Id.* at 299. As applied to profits earned by a racketeer, the Court reasoned that:

> Before profits of an illegal enterprise are divided, each participant may be said to own an "interest" in the ill-gotten gains. After distribution, each will have a possessory interest in currency or other items so distributed. We therefore conclude that the language of the statute plainly covers the insurance proceeds petitioner received as a result of his arson activities.

*Id.* at 300. The Court cautioned that the ruling was not intended "to suggest a particular means of calculating the precise amount that is subject to RICO forfeiture in any given case. We hold simply that the 'interest' subject to forfeiture under § 1963(a)(1) are not limited to interests in an enterprise." [4] *Id.* at 304 n. 3.

The Court subsequently vacated our decision in *McManigal* and remanded for our consideration in light of *Russello.* In a published order we determined that, *Russello* notwithstanding, the forfeiture order in *McManigal* was still improper as there had been no showing that the profits were still in existence at the time of conviction. *United States v. McManigal,* 723 F.2d 580 (7th Cir.1983). The Government now contends that we erred in not ordering forfeiture of McManigal's profits after *Russello.* The Government admits that *McManigal* and this case are factually identical and that if *McManigal* was decided correctly, the forfeiture order must be remanded for a determination of what profits, if any, were still in existence at the time of conviction.

We have no choice except to follow *McManigal,* the law of this circuit. We do note, however, in *Russello* the Court emphasized that the ordinary meaning of "interest" includes an interest in the *future*

---

**4.** The decision of the Fifth Circuit that was reviewed by the Supreme Court in *Russello, United States v. Martino,* 681 F.2d 952 (5th Cir. 1982) (en banc), also specifically refused to determine how or when profits were to be measured.

968

distribution of profits and an interest in the *current* possession of currency. The Court recognized that the purpose of the forfeiture provision is to separate the racketeer from his dishonest gains. This would seem consistent with our conclusion that a defendant cannot forfeit something he no longer has. In fact, the term "forfeiture" implies loss of an interest in something. *See* Black's Law Dictionary 584 (5th ed. 1979); Webster's Third New International Dictionary 891 (1966). Once that "something" is gone, there would be nothing left to forfeit. Thus under *McManigal,* while the racketeer dissipates his profits on wine, women, and song before his conviction and having dissipated his interest in the profits would have nothing left to forfeit, he would, of course still be subject to a substantial fine and term of imprisonment.

We hold, accordingly, that the district court erred in ordering forfeiture of defendant's profits without a showing that those profits were still in existence at the time of conviction. The forfeiture order is Vacated and that portion of the case is Remanded for further proceedings consistent with this opinion. Defendant's conviction is Affirmed.