**UNITED STATES of America**

v.

**Vincent J. CROCE, et al.**

**Nos. CR. 02–819–01, CR. 02–819–02, CR. 02–819–03.**

United States District Court,
E.D. Pennsylvania.

Sept. 8, 2004.

Louis D. Lappen, United States Attorney's Office, Philadelphia, PA, for the Government.

Croce is W. Scott Magargee, Cozen & O'Connor, Philadelphia, PA, for defendant.

Quattrone is Jeffrey M. Miller, Nasuti & Miller, Philadelphia, PA, for defendant.

Gilbert J. Scutti, Dickstein and Scutti, Philadelphia, PA, for defendant Rose.

*MEMORANDUM*

DALZELL, District Judge.

After Vincent J. Croce, Brian J. Rose, and Joseph A. Quattrone, Jr. were convicted of money laundering and other crimes, the Government supplied us with proposed orders that, if signed, would create "forfeiture money judgments" against each of them. Because the defendants did not object, we signed the proposed orders. When the Government asked us to modify those orders, however, we began to question whether Congress authorized us to impose forfeiture money judgments.

*Factual Background*

On December 17, 2002, the Grand Jury returned a sixteen-count indictment against Croce, Rose, Quattrone, and two others [1] charging that they had fraudulent-

---

1. Although the indictment charged five individuals, we use the term "defendants" throughout this Memorandum to refer only to Croce, Rose, and Quattrone.

ly obtained about fourteen million dollars from Independence Blue Cross, a nonprofit health insurance company, by billing for goods and services that were never provided. More technically, the indictment included four counts of mail fraud,[2] five counts of interstate transportation of money taken by fraud,[3] one count of conspiracy to commit money laundering,[4] and three counts of money laundering.[5] In the aggregate, the money laundering and conspiracy to commit money laundering counts alleged that the defendants laundered $2,171,043.45. The indictment also contained five notices of forfeiture, each identifying general "sum[s]" and specific items of personal and real property[6] of which the Government intended to seek forfeiture if the defendants were convicted.

On February 26, 2003, Croce agreed to plead guilty to all of the charges against him and to cooperate with the Government in exchange for the Government's conditional promise to request a downward departure from the Sentencing Guidelines range that would otherwise apply to him. Croce recognized that, as part of his sentence, "[f]orfeiture of any property, real or personal, which constitutes or is derived from proceeds involved in or traceable to the offenses ... may be ordered," Plea Agreement, at 8, and he also agreed to the entry of preliminary and final forfeiture orders, *id.* Attachment A, ¶ b. We accepted Croce's guilty plea on April 2, 2003.

The Government moved for entry of preliminary forfeiture on May 20, 2003, and Croce did not object to the entry of the Government's proposed order. Without the benefit of defense counsel's arguments, we granted the Government's motion and signed its proposed Judgment and Preliminary Order of Forfeiture on June 6, 2003. Part of that Order explained that "a money judgment in the amount of $5,138,935.66 shall be entered against defendant as the amount of property which constitutes or is derived from proceeds traceable to any offense constituting specified unlawful activity." Order of June 6, 2003, at ¶ 3. Note that this sum is 2.37 times larger than the $2,171,043.45 covered by the money laundering counts.[7] On November 5, 2003, we sentenced Croce to fifty-four months' imprisonment, imposed a special assessment of $1,600.00, and ordered him to pay restitution of $14,176,094.17.

Rather than plead guilty, Rose and Quattrone chose to contest the charges against them in a two-week jury trial that began on September 29, 2003. During the course of the trial, Rose testified that he had assets valued at around $800,000.00, and Quattrone testified that he had a total of about $1.2 million in assets. After the jury convicted them of all charges, Rose and Quattrone waived their rights to have a jury determine issues related to forfeiture.

On January 16, 2004, we sentenced Rose and Quattrone each to ninety-four months' imprisonment, directed them each to pay a fine of $15,000.00, imposed special assessments of $1,300.00 on each of them, or-

---

**2.** *See* 18 U.S.C. § 1341 (2004). In addition to the four counts of mail fraud with which all three defendants were charged, Croce was also charged with three other counts of mail fraud that were not alleged to involve Rose or Quattrone.

**3.** *See* 18 U.S.C. § 2314 (2004).

**4.** *See* 18 U.S.C. § 1956(h) (2004).

**5.** *See* 18 U.S.C. § 1956(a)(1)(A)(i), 1956(a)(1)(B)(i) (2004).

**6.** We consider the funds in an identified bank account to be specific personal property, as opposed to general "sums" which could be satisfied from any source.

**7.** Indeed, we cannot divine the source of the $5,138,935.66 the Government proffered to us.

dered them to make restitution of $9,200,000.00 to their victims, and stated that each of them would "forfeit" their interest in $2,611,149.41 to the United States. To further explain that final component of their sentences, we signed proposed Forfeiture Money Judgments that the Government had submitted a few days before the sentencing hearings.[8] Each of the Forfeiture Money Judgments states that a "money judgment in the amount of $2,611,149.41 is hereby entered against the defendant" and also explains that we "retain jurisdiction to enforce [them], and to amend [them] as necessary, pursuant to Fed.R.Crim.P. 32.2(e)." Orders of Jan. 16, 2004, ¶¶ 3, 7.

A few months later, the Government filed three motions. Because we had entered only a preliminary forfeiture order against Croce, the first motion sought entry of a Judgment and Final Order of Forfeiture against him. Like the preliminary order, the proposed final forfeiture order would order the forfeiture of the "sum of $5,138,935.66 United States currency (forfeiture money judgment)" to the United States. We had already entered final Forfeiture Money Judgments against Rose and Quattrone, so the second and third motions sought to substitute "$100,-000 U.S. currency" in partial satisfaction of the $2,611,149.41 forfeiture money judgment against Rose and "$280,000 U.S. currency" in partial satisfaction of the $2,611,149.41 forfeiture money judgment against Quattrone.

The three motions raise complicated questions about the extent of our power to order asset forfeiture in criminal cases. As we examined those questions, we began to doubt whether we even had the authority to order the forfeiture money judgments that we had imposed at the Government's request and without opposition. We directed the Government and invited the defendants to submit additional briefing on these issues, and, having fully considered them, we are at last prepared to rule on the Government's three motions.

*Legal Analysis*

A. *Forfeiture Money Judgments*

The Government's motions assume that we have the power to enter forfeiture money judgments against the defendants. Rather than blithely accept that assumption, we must carefully test it lest we impose a punishment that Congress has not authorized. Of course, we cannot sensibly consider whether Congress has given us the power to impose forfeiture money judgments without first explaining what the concept means.

As we understand it, when the Government requests that we enter a forfeiture money judgment, it is requesting that we enter a money judgment pursuant to our statutory authority to order forfeiture. This understanding assumes that the Government could collect a forfeiture money judgment from a criminal defendant in the same way that a successful plaintiff could collect a money judgment from a civil defendant. Two important consequences flow from our understanding. First, a forfeiture money judgment is *nonspecific* because it is entered for a general sum of money, such as $1 million, even though other kinds of forfeiture are directed at specific items of property (*e.g.*, the $1 million in First National Bank account number 12345 or the 1999 Ford Taurus with VIN# 6789012345).

Second, a forfeiture money judgment is *unlimited* because its magnitude bears no relation to the assets that a convict possesses at any particular time. Imagine, for example, a convict who owns only $10,000 in assets but faces a forfeiture money judgment of $1 million. Even if the

8. Neither Rose nor Quattrone objected to the Government's proposed orders.

Government seized all of the convict's assets, a judgment of $990,000 would remain undischarged. *See* Gov't Br. at 7 ("A money judgment is nothing more than an order reflecting the defendant's liability for a specific sum of money equivalent to the proceeds of the offense *which are no longer available.*") (emphasis added). It is possible that the Government could continue seizing all of the convict's assets, at any time, until he either satisfies the full $1 million judgment or dies (leaving the Government with a sizeable claim on his estate).

With these features in mind, our task is to discern whether Congress authorized us to impose nonspecific and unlimited forfeiture money judgments against convicts.

### B. *Statutory Framework for Forfeiture*

As we have noted, the defendants were all convicted of mail fraud, interstate transportation of money taken by fraud, conspiracy to commit money laundering, and money laundering. Each mail fraud conviction subjected them to up to twenty years' imprisonment and a fine.[9] 18 U.S.C. § 1341 (2004). Interstate transportation of money taken by fraud carries a penalty of not more than ten years' imprisonment and a fine. 18 U.S.C. § 2314 (2004). The money laundering and conspiracy to commit money laundering convictions also each subjected the defendants to up to twenty years' imprisonment and a fine. 18 U.S.C. § 1956(a)(1), (h) (2004).

The defendants were also subject to mandatory restitution. *See* 18 U.S.C. § 3663A (2004).

Although none of these laws provides for forfeiture, a separate statute requires us to order that "a person convicted of an offense in violation of section 1956 [ (*i.e.,* money laundering) ] ... forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property." 18 U.S.C. § 982(a)(1) (2004).[10] In addition to directly forfeitable property,[11] § 982 also subjects "substitute property" up to the value of the directly forfeitable property to forfeiture if the directly forfeitable property:

> [A]s a result of any act or omission of the defendant—
>
> (A) cannot be located upon the exercise of due diligence;
>
> (B) has been transferred or sold to, or deposited with, a third party;
>
> (C) has been placed beyond the jurisdiction of the court;
>
> (D) has been substantially diminished in value; or
>
> (E) has been commingled with other property which cannot be divided without difficulty.

21 U.S.C. § 853(p)(1) (2004); *see also* 18 U.S.C. § 982(b)(1) (2004); *United States v. Voigt,* 89 F.3d 1050, 1088 (3d Cir.1996) (recognizing that § 982(b)(1) incorporates § 853(p)). In short, when a defendant has been convicted of money laundering, Con-

---

**9.** The amount of any fine imposed under Title 18 of the United States Code is governed by 18 U.S.C. § 3571.

**10.** Apart from the money laundering issues, anyone convicted of mail fraud "affecting a financial institution" must forfeit "any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of" the mail fraud. *See* 18 U.S.C. § 982(a)(2) (2004). Neither the jury nor we,

however, found that the defendants' mail fraud affected a financial institution, so we shall confine our discussion to the forfeiture to which they are subject pursuant to § 982(a)(1).

**11.** We refer to property "involved in" money laundering or "traceable to" property involved in money laundering as "directly forfeitable property."

gress has empowered us to order the forfeiture of that defendant's directly forfeitable property and substitute property.[12] Whether our statutory mandate to order money launderers to "forfeit" property also authorizes us to enter forfeiture money judgments against them depends in large measure on what Congress meant by the term "forfeit." To resolve this question, we look to lay and legal definitions of the word, the history of forfeiture in Anglo–American law, appellate decisions construing forfeiture statutes, and the structure of penalties in the federal criminal code.

### C. Definitions

Common sense suggests that one cannot "forfeit" something unless he first owns or possesses it. Thus, the *Oxford English Dictionary* defines *forfeit* to mean "[t]o lose, lose the right to; to render oneself liable to be deprived of (something)." VI *Oxford English Dictionary* 67 (2d ed.1989). On the other hand, the word sometimes means "to have to pay (a sum of money) in consequence of a crime, offence, breach of duty, or engagement." *Id.* While the former definition clearly confirms our instinct that one cannot forfeit something that one does not own, the latter definition contains no such limitation.

Despite the ambiguity in the *OED*, American dictionaries typically define the verb *to forfeit* as to pay, give up, lose, or subject to confiscation as a *forfeit*. As a noun, *forfeit* means "something that has to be paid or given up as a penalty," *Oxford American Dictionary* 255 (1990), or "something to which the right is lost as a result of committing a crime or misdeed," *Webster's Encyclopedic Unabridged Dictionary of the English Language* 556 (1989). These definitions, too, imply that forfeiture derives meaning only within a context of possession. One cannot sensibly speak of having lost something that she does not yet own, but may acquire later.

Legal dictionaries also recognize that ownership must precede forfeiture. For example, *Black's* defines *forfeiture* as "[t]he loss of a right, privilege, or property because of a crime, breach of obligation, or neglect of duty," and further explains that "[t]itle is simultaneously transferred to another, such as the government." *Black's Law Dictionary* 771 (7th ed.1999). Forfeiture could not "simultaneously" transfer title at the time it is ordered unless title was vested, at that time, in the one subject to forfeiture. In other words, this legal dictionary supports our intuition that a court cannot order someone to *forfeit* what he does not own. Indeed, the history of forfeiture confirms that understanding.

### D. History of Criminal Forfeiture

#### 1. British Antecedents

Our modern law of forfeiture sprouted from three seeds. First, in the early Middle Ages, any property that caused some-

---

**12.** Recently adopted Federal Rule of Criminal Procedure 32.2 recognizes that courts have entered forfeiture money judgments. Though the Advisory Committee noted that "a number of cases have approved use of money judgment forfeitures," it judiciously took "no position on the correctness of those rulings." This less-than-enthusiastic discussion of the practice suggests that at least some members of the Committee harbored doubts about courts' power to impose forfeiture money judgments.

Regardless of the Committee's views, it lacked the power to propose—and the Supreme Court lacked any power to adopt—rules that "abridge, enlarge or modify any substantive right." *See* 28 U.S.C. § 2072(b) (2004). Thus, Rule 32.2's references to forfeiture money judgments could not impliedly authorize us to impose them unless a statute also empowered us to do so.

one's accidental death was forfeited to the Crown as a deodand. Jacob J. Finkelstein, *The Goring Ox: Some Historical Perspectives on Deodands, Forfeitures, Wrongful Death and the Western Notion of Sovereignty*, 46 Temp. L.Q. 169, 170–97 (1973); *see also* 1 William Blackstone, *Commentaries* *300–01 [hereinafter Blackstone]; 2 W.S. Holdsworth, *A History of English Law* 47 (Little, Brown, & Co.1923) [hereinafter Holdsworth]. For example, if a horse trampled someone, then the horse would become the king's property, even if its owner took all reasonable steps to prevent injury to others. Traceable to Biblical practice,[13] the law of deodands rested on a legal fiction that treated an object as though it were a guilty person. *Cf. Austin v. United States*, 509 U.S. 602, 615–17, 113 S.Ct. 2801, 2808–09, 125 L.Ed.2d 488 (1993) (discussing the "guilty-property fiction" as it survives American law).

When Parliament codified deodands procedure, it permitted the owner of guilty property to turn over to the king the value of the deodand in lieu of the object itself. *See* Leonard W. Levy, *A License to Steal: The Forfeiture of Property* 12 (1996) [hereinafter Levy]. This substitution of currency for guilty property created a remedy resembling the forfeiture money judgments that the Government seeks here, but there is a fundamental distinction between the two. As we have explained, a forfeiture money judgment is not limited by the value of a convict's assets, but the judgment recognized under the law of deodands could not exceed the value of the guilty property (and thus could not exceed the owner's net worth).

The notion that an object could be guilty independent of its owner's culpability also underpinned the second strand in the history of forfeiture, statutory forfeiture. British customs and revenue laws, most notably the Navigation Acts of 1660 and 1696, allowed only English-owned ships to carry goods to and from the colonies. When a violation occurred, the Acts called for the forfeiture of the illegally carried goods and the ship used to transport them, but did not authorize imposition of nonspecific and unlimited money judgments against the vessel's owner. *See* Jimmy Gurule, *The Ancient Roots of Modern Forfeiture Law*, 21 J. Legis. 155, 157 (1995). In England, forfeiture statutes were enforced in admiralty courts and in the Court of the Exchequer, and these courts developed *in rem* procedures through which goods and vessels could be forfeited without obtaining *in personam* jurisdiction over the owner of the property. *See C.J. Hendry Co. v. Moore*, 318 U.S. 133, 137–38, 63 S.Ct. 499, 501–02, 87 L.Ed. 663 (1943).

The third kind of common law forfeiture—often referred to as "forfeiture of estate"—resulted from conviction of treason or a felony. At common law, these crimes were punishable by death, and, as a companion to capital punishment, convicts became "attainted" at the moment that their sentences were pronounced. 4 Blackstone, at *380–81. Attainder amounted to "civil death" and deprived the convict of all civil rights, including the right to own property. Thus, an attainted traitor forfeited his real and personal property to the Crown. *Id.*, at *381, *386–87; 3 Holdsworth, at 70–71, 329. While a felon's personal property was also forfeit to the sovereign, 4 Blackstone, at *386–87; 3 Holdsworth, at 329, the Magna Carta

---

**13.** *See* Exodus 21:28 (King James Version) ("If an ox gore a man or a woman, that they die: then the ox shall be surely stoned, and his flesh shall not be eaten; but the owner of the ox shall be quit."); *see also* Oliver Wendell Holmes, The Common Law 6–25 (Little, Brown, & Co.1938) (1881) (citing analogous principles from the legal traditions of other early civilizations).

protected the right of the felon's mesne lord to escheat of the attainted felon's real property, after the king held the lands for a year and one day, *id.* at 69; 4 Blackstone, at *386.[14] Because forfeiture of estate was an inexorable consequence of conviction for treason or felony, and because one could not be convicted *in absentia* of these offenses, *see* 4 Blackstone, at *375, this third species of forfeiture operated only *in personam.* A suspect's chattels or lands could not be forfeited in an *in rem* proceeding. Moreover, though an attainted subject lost all right to own property, he had no obligation to relinquish to the sovereign more than he owned at the time of conviction.

### 2. *Early American Experience*

Of these three seeds of modern forfeiture law, only statutory forfeiture took root in America. "Deodands did not become part of the common-law tradition of this country." *Calero–Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 682, 94 S.Ct. 2080, 2091, 40 L.Ed.2d 452 (1974). In cases of treason, the Constitution prohibited attainder from "work[ing] Corruption of Blood, or Forfeiture except during the Life of the Person attainted," U.S. Const. art III, § 3, and the first Congress declared that felony convictions would not "work corruption of blood, or any forfeiture of estate," *see* Act of April 30, 1790, ch. 9, § 24, 1 Stat. 112, 117 (formerly codified at 18 U.S.C. § 3563).[15]

Though neither forfeiture of estate nor deodands have exerted much influence on American law, the British insisted that the colonies enforce the Navigation Acts.

Courts of the Exchequer were never established in the colonies, but "the common law courts in the Colonies—and later in the states during the period of the Confederation—... exercis[ed] jurisdiction *in rem* in the enforcement of forfeiture statutes." *C.J. Hendry Co.,* 318 U.S. at 139, 63 S.Ct. at 503. As colonial discontent with the Navigation Acts grew, however, juries in the common law courts became increasingly unlikely to convict fellow Americans of violating these laws. In response, Parliament sidestepped the common law courts by creating one vice admiralty court for each colony in 1696. In the juryless vice admiralty courts, British prosecutors could more easily obtain the forfeiture of American vessels that violated the Navigation Acts. *See* Levy, at 42.[16] After the Constitution replaced the Crown as the supreme authority in America, both state and federal statutes authorized *in rem* forfeitures. *See, e.g.,* Act of July 31, 1789, ch. 5, §§ 12, 36, 1 Stat. 29, 39, 47–48; Act of Aug. 4, 1790, ch. 35, §§ 13, 22, 27, 28, 67, 1 Stat. 145, 157–58, 161, 163–64, 176–77; *see also C.J. Hendry Co.,* 318 U.S. at 149–50, 63 S.Ct. at 508–09 (discussing state laws).

*In rem* civil forfeiture proceedings have remained common throughout our history, and "contemporary federal and state forfeiture statutes reach virtually any type of property that might be used in the conduct of a criminal enterprise." *Calero–Toledo,* 416 U.S. at 683, 94 S.Ct. at 2092; *see also* Levy, at 39–61 (chronicling development of American forfeiture law). *In personam* forfeitures following criminal conviction, on

---

**14.** In addition to forfeiture of estate, attainder also worked a corruption of the blood, so no one could inherit from or through an attainted person. 4 Blackstone, at *388; 3 Holdsworth, at 69.

**15.** This statute remained in force for nearly two centuries, until section 212(a)(2) of the

Comprehensive Crime Control Act of 1984, Pub.L. No. 98–473, 98 Stat. 1976, 1987, repealed it.

**16.** Surely with this in mind, the Declaration of Independence complained that the British had "depriv[ed the colonists], in many cases, of the benefits of Trial by Jury."

the other hand, were unknown here at least from the statutory abolition of forfeiture of estate in 1790 until the enactment of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), Pub.L. No. 91–452, §§ 901–904, 84 Stat. 922, 941–948 (1970) (codified as amended at 18 U.S.C. §§ 1961–1968); Levy, at 61.

In sum, deodands, forfeiture of estate, and statutory forfeiture did not involve the kind of nonspecific and unlimited money judgment that the Government seeks here. Thus, to the extent that these historical practices shed light on the meaning of the term "forfeit" in 18 U.S.C. § 982, they suggest that Congress did not intend to authorize the imposition of nonspecific and unlimited forfeiture money judgments when it required district courts to order money launderers to "forfeit" certain property.

### E. *American Precedent*

#### 1. *RICO*

As the first statute authorizing criminal forfeiture through an *in personam* proceeding, RICO not only provides the historical link between the American tradition of *in rem* civil forfeiture and the *in personam* criminal forfeiture that the Government seeks from the defendants here, but it also afforded appellate courts their first vehicle to consider whether, in authorizing criminal forfeiture, Congress intended to permit forfeiture money judgments.

RICO "was intended to provide new weapons of unprecedented scope for an assault upon organized crime and its economic roots." *Russello v. United States*, 464 U.S. 16, 26, 104 S.Ct. 296, 302, 78 L.Ed.2d 17 (1983). Section 1962 contains RICO's substantive provisions, including prohibition of the use of income derived from a pattern of racketeering activity to acquire an interest in an enterprise engaged in interstate commerce. *See* 18 U.S.C. § 1962(a) (2004). Someone convicted of violating section 1962 faces up to life imprisonment, heavy fines, and forfeiture. *See* 18 U.S.C. § 1963(a) (2004). As originally enacted, RICO's forfeiture provision required any person convicted of violating its substantive provisions to:

> Forfeit to the United States (1) any interest he has acquired or maintained in violation of section 1962, and (2) any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which he has established, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962.

Pub.L. No. 91–452, § 901, 84 Stat. 922, 943 (1970) (codified at 18 U.S.C. § 1963).[17] Finding them instructive on the issues before us, the Government directs our attention to several decisions from the Fifth and Seventh Circuits that interpret the RICO forfeiture provision, *see* Gov't Br. at 5–6, and we turn now to those cases.

#### a. *Fifth Circuit*

One of the earliest important cases interpreting RICO's original forfeiture provision arose out of an arson ring that operated in Florida between 1973 and 1976. *See United States v. Martino*, 648 F.2d 367 (5th Cir.1981) [hereinafter *Martino I*]. Members of the ring would purchase property and fire insurance in amounts greater than the property's purchase price. After a "torch" burned each of the properties, the owner would submit

---

17. Congress significantly revised § 1963 in the Comprehensive Forfeiture Act of 1984, Pub L. No. 98–473, §§ 302, 98 Stat. 2040, 2040–44. The Anti–Drug Abuse Act of 1986, Pub.L. No. 99–570, § 1153(a), 100 Stat. 3207, 3207–13 (codified at 18 U.S.C. § 1963(m)), "quietly" added language that permitted forfeiture of substitute property. *See* Levy, at 117 (describing adoption of substitute asset provision).

a claim for the loss, and the members would divide the proceeds. *Id.* at 380. Following their conviction, the jury ordered several of the conspirators to forfeit "monies received as insurance payments upon the successful burning of their properties." *See United States v. Martino,* 681 F.2d 952, 953 (5th Cir.1982) (en banc) [hereinafter *Martino II* ].[18] Though most of the forfeiture money judgments were entered in amounts less than $5,000.00, the money judgment against Joseph C. Russello [19] was for $340,043.69. *Id.*

A panel of the Fifth Circuit Court of Appeals vacated the forfeiture money judgments because it concluded that " § 1963(a)(1) was intended to reach only interests in an enterprise and not the profits or income from racketeering activity." *See id.* The *en banc* Fifth Circuit vacated the panel opinion and affirmed entry of the forfeiture money judgments, holding that the term "interest" in § 1963(a)(1) was "broad enough to include profits or income." *Id.* at 954. In addition to the text of the statute, the court relied on RICO's legislature history to explain that the success of § 1963(a)'s "two pronged attack on the sources of economic power which feed the coffers and activities of organized crime ... demands both divestiture of power over the enterprise itself and seizure of the income derived from racketeering activities." *Id.* at 957 (footnote omitted). The court also noted a question that arose at oral argument about "whether the government has an obligation to trace and identify the current form of monetary proceeds before it may collect on a forfeiture order," but it left the question for the "district court to determine in the first instance." *Id.* at 960–61.

Russello appealed the *en banc* decision to the Supreme Court. *See Russello v. United States,* 464 U.S. 16, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983). Explaining that "the term 'interest' comprehends all forms of real and personal property, including profits and proceeds," the Court affirmed the Fifth Circuit's ruling. *See id.,* 464 U.S. at 21, 104 S.Ct. at 299. Like the Court of Appeals, the Supreme Court also deployed RICO's legislative history to demonstrate that "the intent to authorize forfeiture of racketeering profits seems obvious" because "in the view of Congress, the economic power of organized crime derived from its huge illegal profits." *Id.,* 464 U.S. at 28, 104 S.Ct. at 303. Still, the Court was careful not to decide any more than whether the "interests" subject to forfeiture under § 1963(a)(1) were limited to interests in an enterprise. *See id.,* 464 U.S. at 29 n. 3, 104 S.Ct. at 304 n. 3.

While both *Martino II* and *Russello* ultimately affirmed the entry of a forfeiture money judgment, neither the Fifth Circuit nor the Supreme Court considered whether RICO authorized unlimited and nonspecific forfeiture money judgments. Instead, they focused on whether courts could order only the forfeiture of a defendant's interest in a criminal enterprise or whether § 1963(a)(1) permitted the forfeiture of "profits and proceeds" of racketeering activity. The Court of Appeals left the questions that concern us here to its district court to resolve, so the Supreme Court had no occasion to consider them.

### b. Seventh Circuit

In a criminal case against Peter Alexander, a lawyer who had bribed the Cook

---

**18.** Although the *Martino II* court stated that the "jury" ordered the forfeitures, it seems likely that the jury only determined the amount of money subject to forfeiture and the district court actually entered forfeiture money judgments against the defendants.

**19.** Russello was one of the owners of a "torched" property, *Martino I,* 648 F.2d at 380, and no published opinion describes his net worth.

County Board of Appeals to reduce his clients' property tax assessments, the Seventh Circuit took up the issues that *Martino* and *Russello* left unresolved. *See United States v. Alexander,* 741 F.2d 962 (7th Cir.1984). When the district court ordered Alexander to forfeit $51,874.53 in legal fees that he had earned from his participation in the bribery scheme, *id.* at 963, he challenged the forfeiture order. The Court of Appeals framed the issue before it as whether "profits subject to forfeiture [are] limited to those in defendant's possession at the time of conviction," *id.* at 967, and vacated the forfeiture money judgment against Alexander after deciding that the property subject to forfeiture was so limited:

> [T]he term "forfeiture" implies loss of an interest in something. Once that "something" is gone, there would be nothing left to forfeit.... [W]hile the racketeer dissipates his profits on wine, women, and song before his conviction and having dissipated his interest in the profits would have nothing left to forfeit, he would, of course still be subject to a substantial fine and term of imprisonment.

*Id.* at 968 (citation omitted). In essence, the court concluded that, by using the term "forfeit" in RICO, Congress did not intend to empower courts to enter nonspecific and unlimited forfeiture money judgments. Though it did not explore the historical terrain that we summarized above, the *Alexander* court's decision correctly suggests that "forfeiture" has never meant that a convict must give up any more than he owns at the time a judge orders forfeiture.

Alexander was not the only lawyer at the Cook County Board of Appeals trough. Richard A. Ginsburg was also convicted of bribing Board members, and the district judge ordered him to forfeit $225,000 in legal fees pursuant to § 1963(a)(1). On appeal, Ginsburg argued that "the govern-ment failed to prove beyond a reasonable doubt that the legal fees he had received ... were still in existence at the time of his conviction." *United States v. Ginsburg,* 773 F.2d 798, 799 (7th Cir.1985) (*en banc*). Following *Alexander* and other similar cases, a panel of the Seventh Circuit accepted Ginsburg's argument, but the *en banc* Court of Appeals vacated the panel's decision and affirmed the forfeiture money judgment against Ginsburg.

The *en banc* court rested its conclusion on the "characteristics" of criminal forfeiture:

> Since RICO forfeiture is a sanction against the individual defendant rather than a judgment against the property itself, "it follows the defendant as a part of the penalty and thus it does not require that the government trace it, even though the forfeiture is not due until after conviction." *United States v. Conner,* 752 F.2d 566, 576 [ (11th Cir.1985) ]. It therefore does not matter whether the government recovers the identical dollars that the defendant received in violation of section 1962, as long as the amount that the defendant acquired in violation of the statute is known.

*Id.* at 801. The Seventh Circuit further explained that "[t]he goal of RICO's forfeiture provision was to remove the profit from organized crime by separating the racketeer from his dishonest gains" and, to accomplish that purpose, "the statute requires him to forfeit to the United States the total amount of the proceeds of his racketeering activity, regardless of whether the specific dollars received from that activity are still in his possession." *Id.* at 802 (quotations omitted). To the extent that *Alexander* and other cases were inconsistent with that understanding of the RICO forfeiture provisions, the *en banc* Seventh Circuit overruled them. *Id.*

Although *Ginsburg* stands for the proposition that courts in "RICO forfeiture" cases may enter nonspecific and unlimited forfeiture money judgments, its reasoning is suspect and unpersuasive. *See generally* Graeme W. Bush, *The Impact of RICO Forfeiture on Legitimate Business,* 65 Notre Dame L.Rev. 996, 1004–07 (1990) (criticizing *Ginsburg* ). First, the opinion notes that civil *in rem* forfeiture is by its very nature directed at specific property and infers from the fact that RICO created a novel criminal *in personam* forfeiture penalty that Congress did not intend to require courts ordering forfeiture under RICO to identify specific property subject to forfeiture.[20] Of course, the Seventh Circuit was correct that RICO authorizes *in personam* forfeiture, but it does not necessarily follow that *in personam* proceedings may result in the forfeiture of unspecified property. Indeed, only one year after *Ginsburg,* Congress added language authorizing forfeiture of substitute assets to address problems posed by defendants who dissipate their assets between indictment and conviction. *See* Anti–Drug Abuse Act of 1986, Pub.L. No. 99–570, § 1153(a), 100 Stat. 3207, 3207–13 (codified at 18 U.S.C. § 1963(m)). This amendment would have been unnecessary if, as *Ginsburg* holds, RICO's original *in personam* forfeiture provision empowered courts to enter nonspecific forfeiture money judgments. *See also United States v. Voigt,* 89 F.3d 1050, 1086 (3d Cir.1996) ("[I]f the legitimacy of [*Ginsburg 's*] interpretation of the RICO statute had been beyond doubt, then the addition of a substitute asset provision to the RICO . . .

forfeiture scheme [ ] would seem superfluous.").

More seriously, *Ginsburg* uses its understanding of Congressional purpose to rewrite RICO's forfeiture provision. We agree that Congress intended RICO as a "comprehensive and unprecedented attack on organized crime and its economic bases," *Ginsburg,* 773 F.2d at 802, but that intent does not explain precisely *how* comprehensive Congress intended for it to be. The Seventh Circuit simply used the premise that RICO was meant to swipe expansively to justify its choice of the broader of two competing interpretations of the term "forfeit." Because that approach ignores the possibility of any limits on RICO forfeiture,[21] we choose instead to look to the word's definitions, history, and place in federal criminal law to give content to Congress's phrasing.

Finally, it bears stressing that *Ginsburg* construes RICO, and we are charged with interpreting 18 U.S.C. § 982. Whereas the former authorizes forfeiture of "interests" generally, the latter authorizes the forfeiture of property "involved in" or "traceable to" property involved in money laundering. This distinction is significant because *Ginsburg* emphasized that "the legislative history of RICO does not support the defendant's interpretation of section 1963(a)(1) as requiring the government to *trace* the proceeds of racketeering activity in order to prove that they are still in existence at the time of conviction." *Ginsburg,* 773 F.2d at 802 (emphasis added). It appears, therefore, that *Ginsburg* is inapposite here because it attempted to answer the open question of whether

---

**20.** As support for this line of reasoning, the Seventh Circuit relies on the odd case *United States v. Conner,* 752 F.2d 566 (11th Cir. 1985). *Conner* takes quotes from other cases out of context and strings them together in an attempt to justify the imposition of nonspecific and unlimited forfeiture money judgments.

*See id.* at 575–77. Its reasoning suffers from many of the same faults that we will attribute to *Ginsburg* and is similarly unpersuasive.

**21.** After all, it would always justify the choice of the most expansive imaginable interpretation.

RICO required tracing of a defendant's assets, a question that Congress has already answered in the money laundering context. *See also Voigt*, 89 F.3d at 1085 (describing *Ginsburg* as a case "dealing with the tracing issue in the context of . . . the RICO statute's criminal forfeiture provision").

We have looked to the significant decisions of the Fifth and Seventh Circuits interpreting RICO's original forfeiture provisions for guidance in determining whether § 982 authorizes us to impose nonspecific and unlimited forfeiture money judgments. The Fifth Circuit, however, concentrates on the meaning of the term "interest" in § 1963(a)(1) and do not analyze whether courts have the power to enter forfeiture money judgments. While the Seventh Circuit grapples with this issue, we have just explained the reasons why *Ginsburg*, the court's most recent statement, is unpersuasive.[22] In short, the holdings in the RICO cases that the Government cites do not illuminate the meaning of the term "forfeit" in § 982.

### 2. *Money Laundering*

Though the Government's citation to RICO forfeiture cases required us to digress, this case involves the money laundering forfeiture statute, so we must consider carefully the few precedents that mention the availability of forfeiture money judgments under § 982.

The most important of these cases challenged the forfeiture order entered against John Voigt, who had defrauded investors of more than $18 million over the course of three years. *See United States v. Voigt*, 89 F.3d 1050, 1059 (3d Cir.1996). After a jury convicted him of committing about $1.6 million in money laundering offenses:

[T]he district court determined that Voigt's money laundering convictions rendered him liable to the government for $1,661,960 in criminal forfeiture. In satisfaction of that amount, the court ordered forfeiture of, *inter alia*, two pieces of jewelry, finding by a preponderance of the evidence that they were items of personal property traceable to the money involved in the money-laundering violations. The jewelry had been purchased with funds from an account in which money laundering proceeds had been commingled with other funds—numerous deposits and withdrawals having intervened between the deposit of the laundered funds and the purchase of the jewelry.

*Id.* at 1081 (alterations, quotations, and citations omitted). Our Court of Appeals first held that the district court properly applied the preponderance of the evidence standard to the forfeiture proceedings, *see id.* at 1082–84, before considering whether forfeiture of the jewelry was also appropriate.

Voigt argued that the jewelry was not directly forfeitable property because, although he purchased it with funds drawn from an account in which he commingled money laundering proceeds with other funds, the jewelry itself was not "involved in" the money laundering and the Government did not prove that jewelry was "traceable to" property involved in the money laundering. The Government, on the other hand, insisted that the *in personam* character of criminal forfeiture "obviate[d] the need for strict tracing, especially" where the commingling of tainted and untainted funds made tracing virtually impossible. *Id.* at 1084.

The Court of Appeals framed the issue before it by explaining that:

---

**22.** Similarly, we are not persuaded by cases that uncritically accept *Ginsburg's* holding. *See, e.g., In re Billman*, 915 F.2d 916, 920 (4th Cir.1990); *United States v. Robilotto*, 828 F.2d 940, 948–49 (2d Cir.1987).

When a defendant has been convicted of committing $1.6 million in money laundering offenses (as Voigt was here), the government has proved beyond a reasonable doubt that it is entitled to $1.6 million in criminal forfeiture; that amount represents property "involved in" money laundering activity for purposes of § 982(a)(1). What is at issue here is the question of *how* the government may go about seizing property in satisfaction of that $1.6 million amount. *Id.* at 1084–85. Emphasizing the presence of the phrase "traceable to" in § 982(a)(1), the court then held that "the government must prove ... that the property it seeks ... in satisfaction of the amount of criminal forfeiture to which it is entitled has *some* nexus to the property 'involved in' the money laundering offense." *Id.* at 1087. The court reached this decision even though it recognized that "[w]here the property involved in a money laundering transaction is commingled in an account with untainted property, ... the government's burden of showing that money in the account or an item purchased with cash withdrawn therefrom is 'traceable to' money laundering activity will be difficult, if not impossible, to satisfy." *Id.*

Because the jewelry was not "involved in" or "traceable to" property involved in Voigt's money laundering activities, the Court of Appeals held that it was not directly forfeitable under § 982(a)(1). *See id.* at 1088. Nevertheless, the court emphasized that property that was not subject to forfeiture under § 982(a)(1) could be subject to forfeiture as substitute property under § 982(b)(1). Recognizing that "the government continue[d] to be entitled to $1.6 million in criminal forfeiture," the Court of Appeals remanded the case to the district court to determine if the jewelry could be forfeited as substitute property in partial satisfaction of the $1.6 million to which the Government was entitled. *Id.*

*Voigt* highlights one substantive and one procedural issue that are relevant to this case. Substantively, it recognizes that § 982(a)(1) entitles the Government to forfeiture of money up to the value of laundered funds. Under this principle, the Government is entitled to forfeiture of up to $2,171,043.45 from each of the defendants here because they all either pled guilty to, or were convicted of, laundering that precise amount of money. It most assuredly is not entitled to 2.37 of that princely sum. Procedurally, *Voigt* explains that when, as here, the Government cannot trace the laundered funds to specific property for any of the reasons enumerated in 21 U.S.C. § 853(p), it may obtain the forfeiture of other specific property.

As we read it, however, *Voigt* does not hold that a district court may enter a forfeiture money judgment in the amount of the laundered funds.[23] Although the

---

**23.** We are aware that the First Circuit has stated broadly that "the government is entitled to an *in personam* judgment against the defendant for the amount of money the defendant obtained as proceeds of the [money laundering] offense," *see United States v. Candelaria–Silva,* 166 F.3d 19, 42 (1st Cir.1999), but we are not persuaded by its decision. First, it offers no authority or reasoning to support its assertion, suggesting that it simply assumed that the Government was entitled to a forfeiture money judgment without carefully considering the question. Second, the court explicitly noted that the defendant "d[id] not

challenge the $6,000,000 money judgment" entered against her, *id.* at 44, so the question of whether the district court had the power to enter the forfeiture money judgment was not before the Court of Appeals and the above-quoted language was pure dicta. For similar reasons, we also decline to follow those cases that rely on *Candelaria–Silva. See, e.g., United States v. Baker,* 227 F.3d 955, 970 (7th Cir.2000) (relying on *Candelaria–Silva* and *Ginsburg* to approve of the entry of a forfeiture money judgment, even though the defendant "d[id] not assert on appeal that the [district] court erred in its order to forfeit a large

case discusses the Government's "entitlement" to forfeiture, it never states that the district court had entered a forfeiture money judgment against Voigt. In fact, the opinion concentrates on whether the district court properly ordered the forfeiture of specific property—the jewelry—not whether the court had the power to enter a nonspecific and unlimited forfeiture money judgment. As the precedent of our Circuit, the holding in *Voigt* binds us. Because *Voigt* does not hold that we have the power to enter a forfeiture money judgment, however, we must resolve the issue for ourselves.

### F. Structure of Sanctions

The range of punishments that federal law imposes on those convicted of money laundering suggests that we lack the power to enter nonspecific and unlimited forfeiture money judgments. In addition to the forfeiture sanction on which most of this Memorandum has focused, Congress has also authorized us to include as part of a money launderer's sentence "a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater." 18 U.S.C. § 1956(a)(1) (2004).

Forfeiture money judgments of the type that the Government would have us enter here are functionally equivalent to fines. Both fines and forfeiture money judgments are payable to the Government, unlimited by the defendant's assets at the time of his conviction, and not directed at specific "guilty" assets. Thus, if we had the power to enter forfeiture money judgments in addition to the power to fine, we could require a money launderer to pay the Government *three times* the amount of the

laundered funds, even though the text of the money laundering statute only authorizes fines up to twice the value of the property involved in the money laundering.

Put another way, the Government's construction of § 982 would permit an end-run around § 1956(a)(1)'s limitation on fines. Congress authorized both forfeitures and fines, and we cannot accept an interpretation of the term "forfeit" that would obliterate any distinction between them.

### Conclusion

The money laundering statute forfeiture statute, 18 U.S.C. § 982, directs us to order the defendants to "forfeit" certain property. Common-sense notions and dictionary definitions of *forfeit* suggest that one cannot forfeit something that he does not possess. From the time of deodands, forfeiture of estate, and the Navigation Acts until the enactment of RICO, courts had never used their power to order forfeiture to compel defendants to relinquish more than they own. Ever since RICO became law, only a few courts have held explicitly that the power to order forfeiture includes the power to enter nonspecific and unlimited forfeiture money judgments, and their decisions are neither persuasive nor binding on us. Finally, Congress's careful distinction between fines and forfeitures suggests that we should resist any attempt to "amend the act" [24] and conflate the two penalties.

For all of these reasons, we hold that § 982 does not authorize us to enter forfeiture money judgments. Thus, we shall vacate the Judgment and Preliminary Order of Forfeiture against Croce that we signed on June 6, 2003 and the Forfeiture

---

amount of money that he does not now have").

**24.** *Hill v. Wallace,* 259 U.S. 44, 71, 42 S.Ct. 453, 459, 66 L.Ed. 822 (1922). *See also United States v. Jackson,* 390 U.S. 570, 578–79, 88

S.Ct. 1209, 1214–15, 20 L.Ed.2d 138 (1968)("it would hardly be the province of the courts to fashion a remedy" when there was not "the slightest indication that Congress contemplated any such scheme.").

Money Judgments against Rose and Quattrone that we signed on January 16, 2004. *Cf. Henslee v. Union Planters Nat. Bank & Trust Co.,* 335 U.S. 595, 600, 69 S.Ct. 290, 293, 93 L.Ed. 259 (1949) (Frankfurter, J., dissenting) ("Wisdom too often never comes, and so one ought not to reject it merely because it comes late."). Because the Government's three motions that are now before us seek amendment of those orders, we shall deny them, too.

Still, the Government remains entitled to the forfeiture of up to $2,171,043.45 from each defendant,[25] and we remain ready to order forfeiture of specific items of each of the defendants' property up to that amount.[26] We shall not, however, permit the specter of a nonspecific and unlimited forfeiture money judgment to haunt the defendants for the rest of their lives. The Government is entitled to forfeiture of their very last penny, but not a penny more.

### ORDER

AND NOW, this 8th day of September, 2004, upon consideration of the Government's motion for judgment and final order of forfeiture against Vincent J. Croce (docket entry # 182), its motion to forfeit substitute assets from Brian J. Rose (docket entry # 186), and its motion to forfeit substitute assets from Joseph A. Quattrone, Jr. (docket entry # 180), and in accordance with the accompanying Memorandum, it is hereby ORDERED that:

1. The Judgment and Preliminary Order of Forfeiture against Croce of June 6, 2003 (docket entry # 57) is VACATED;

2. The Forfeiture Money Judgment against Rose of January 16, 2004 (docket entry # 159) is VACATED;

3. The Forfeiture Money Judgment against Quattrone of January 16, 2004 (docket entry # 153) is VACATED;

4. The Government's motion for judgment and final order of forfeiture against Vincent J. Croce is DENIED WITHOUT PREJUDICE;

5. The Government's motion to forfeit substitute assets from Brian J. Rose is DENIED WITHOUT PREJUDICE;

6. The Government's motion to forfeit substitute assets from Joseph A. Quattrone, Jr. is DENIED WITHOUT PREJUDICE;

7. Page 5 of the Judgment of January 20, 2004 against Rose (docket entry # 162) is AMENDED to delete "$2,611,149.41" from the forfeiture order;

8. Page 5 of the Judgment of January 20, 2004 against Quattrone (docket entry # 156) is AMENDED to delete "$2,611,-149.41" from the forfeiture order; and

9. By November 8, 2004, the Government shall FILE motions for forfeiture

---

25. The Judgments against Rose and Quattrone indicate that they shall each "forfeit [their] interest[s] in the following property to the United States: $2,611,149.41." *See* Judgment of January 20, 2004 against Rose, at 5 (docket entry # 162); Judgment of January 20, 2004 against Quattrone, at 5 (docket entry # 156). Because they were convicted of laundering only $2,171,043.45, however, the Government is entitled to forfeiture of only that amount of property. Moreover, because we lack the power to enter nonspecific and unlimited forfeiture money judgments, we can-

not *yet* enter any forfeiture order against them. Thus, we shall amend the Judgments against Rose and Quattrone to remove any requirement that they forfeit property to the United States at this time.

26. To that end, the Government should file motions for forfeiture orders against the defendants within sixty days. These motions should identify specific property that the Government wants the defendants to forfeit and should explain the basis—under § 982(a)(1) or § 982(b)(1)—for each requested forfeiture.

orders against Croce, Rose, and Quattrone that conform with our Memorandum.